**DR. KAREEM ABDULGHANI, Plaintiff**

v.

**VIRGIN ISLANDS SEAPLANE SHUTTLE, INC., Defendant**

Civil Action No. 1987/156

District Court of the Virgin Islands

Div. of St. Croix

August 23, 1990

GERALD T. GRONER, ESQ., St. Croix, V.I. and THOMAS ALKON, ESQ., GORDON C. RHEA, ESQ., St. Croix, V.I., *for plaintiff*

JOHN K. DEMA, ESQ., St. Croix, V.I. and DAVID N. ZEEHANDELAAR, ESQ., ELLEN D. FINE, ESQ. (BOLGER, PICKER AND WEINER), Philadelphia, PA, *for defendant*

BROTMAN, *Acting Chief Judge*

A jury awarded plaintiff, Dr. Kareem Abdulghani, $5.5 million for economic loss and pain and suffering sustained as a proximate result of a seaplane crash caused by the negligence of defendant Virgin Islands Seaplane Shuttle (hereinafter "Seaplane Shuttle").

Presently pending is defendant's motion for remittitur or for new trial pursuant to Fed. R. Civ. P. 59(a). This motion is grounded on the following seven arguments:

1. The jury verdict is so grossly excessive it would be unconscionable to allow it to stand.

2. The jury verdict was not rationally related to the evidence presented at trial.

3. The verdict is against the weight of the evidence.

4. The jury was prejudiced by various references to defendant's insurance coverage.

5. There were various evidentiary errors throughout the trial including allowing expert testimony beyond the scope of a witness's experience and permitting the jury to assess damages when it was presented with no basis for reducing the damages to present value.

6. Other grounds that may be discovered after a review of the trial transcript.

7. Newly discovered evidence, which would result in a significantly reduced award, requires a new trial.

See Defendant's Motion For New Trial at 1. Because plaintiff's failure to present sufficient evidence to allow the jury to reduce the award to its present value is dispositive, it is unnecessary to reach the other issues raised by defendant.

## I. FACTS AND PROCEDURE

Dr. Kareem Abdulghani was a passenger on a Seaplane Shuttle plane that crashed on October 28, 1986. After the accident, plaintiff was taken to the St. Croix Hospital emergency room where he received treatment for multiple lacerations, contusions, and a head injury. Abdulghani checked out of the hospital that day, and returned to finishing the task which he had set out to accomplish that morning.

Plaintiff filed suit on June 12, 1987 alleging that he was no longer able to practice medicine as a result of post-traumatic stress disorder from the Seaplane Shuttle crash. Defendant admitted liability

for purposes of the trial but denied that plaintiff suffered to the extent he claimed. The court issued two in limine rulings. First, evidence of plaintiff's plans to open an urgent care clinic on St. Croix was stricken for lack of an adequate foundation. Abdulghani v. Virgin Islands Seaplane Shuttle, Inc., 1989 U.S. Dist. LEXIS 13169 (D.V.I. 1989). The court also ruled that evidence concerning the death and injuries of other passengers was inadmissible because of its overwhelming prejudicial value in relation to its probative value. Abdulghani v. Virgin Islands Seaplane Shuttle, Inc., slip op. (D.V.I. 1989) (relying on Fed. R. Evid. 403).

A three day trial was held from March 12 through March 14, 1990 in the Division of St. Croix. The only issue presented to the jury was the amount of damages plaintiff had suffered as a result of the plane crash.[1] Two elements of damages were presented to the jury: lost earning capacity and pain and suffering. The jury awarded plaintiff the sum of $5,500,000 in a general verdict.

## II. THE TRIAL

A fairly detailed recitation of the evidence presented at trial is required to understand the current motion. Plaintiff's first witness was Willard John, an employee with the Department of Education who knew Abdulghani through his cultural work in the community. John testified that he saw Abdulghani as he was being brought to shore in a boat from the site of the crash. Abdulghani was assisted from the boat, and John helped him to a police car where he lay down in the back seat. According to John, Abdulghani was sometimes incoherent, and complained of a pain in his head. John helped him from the car into a wheelchair at the hospital.

Cross-examination focused on how John had come to know Abdulghani through meeting him in plaintiff's bookstore in Frederiksted. As the testimony showed, the bookstore was devoted to Caribbean history and culture.

Plaintiff next presented the deposition testimony of Dr. Lawrence Rawlings, a staff surgeon at St. Croix hospital who was the coordinator for the emergency room at the time of the accident. Rawlings was the first doctor to examine persons brought in from the plane crash,

---

[1] The Special Interrogatory Form submitted to the jury contained a single question: "State what sum would fairly and adequately compensate plaintiff for his damages proximately caused by the seaplane accident."

337

and he testified that Abdulghani had contusions, lacerations, and a closed-head injury. He also stated that there was a possibility that plaintiff had lost consciousness. Rawlings further testified that Abdulghani checked out of the hospital even though it was the hospital's policy in general, and it had been the treating physician's request in this case, to keep a patient who had suffered a head trauma overnight for observation. Rawlings stated that Abdulghani checked himself out against medical advice, and that he was "too upset to know what he was doing." Deposition at 15. In fact, Rawlings stated that Abdulghani "was somewhat agitated at the time and I didn't know what he was saying." Deposition at 15.

Rawlings proceeded to recount that Abdulghani consulted him at some point after the accident and complained of dizziness, abdominal pains, nausea, intermittent headaches, and soreness in his forearm, hand, and wrist. Rawlings diagnosed this as a possible post-concussion syndrome. Rawlings further testified that Abdulghani had returned to work for a short period of time, but then stopped because he was no longer able to function effectively. Although no one at the hospital had asked Abdulghani to stop, Rawlings stated that it would not have been wise to have a doctor continue to practice when the doctor himself thought he was unable to do so.

The next witness was Doctor Olaf Hendricks, the chief in-patient psychiatrist at Charles Harwood Hospital in St. Croix. He was offered as an expert in psychiatry, and there were no objections to his credentials. Trial Testimony (March 12, 1990). Hendricks testified that he received a call on the radio "that there was a plane crash and that there was some serious injuries and at least one death." Trial Testimony (March 12, 1990). Hendricks further stated that the code he received was "of the highest level, meaning there was at least one death." Trial Testimony (March 12, 1990). Defendant objected at this point and a side-bar conference was held. Counsel for Seaplane Shuttle argued that there had been two mentions of a death as a result of the seaplane crash despite the court's in limine ruling precluding any mention by witnesses of death or injury to others who were in the plane. Defendant did not move for a mistrial, however, at this time. Plaintiff's counsel concurred that there had been an error in that the witness had made a mention of a death, and agreed to try to avoid such occurrences in the future.

Hendricks then testified that Abdulghani was not himself on the day of the accident. He was confused, agitated, and unwilling to accept treatment. Hendricks thought he was in a post-concussive state.

338

Several weeks later, Abdulghani came in to see Hendricks. At that time, Abdulghani complained of nightmares, feelings of pain, and a fear of driving. At first, he had no appointment and wanted to keep his visits informal; soon he wanted them to be more formal as he thought he would need medication. Hendricks noticed that Abdulghani had become preoccupied with death and dying. Hendricks thought that he had seen Abdulghani "about at least, about, ballpark figure, 50 times," Trial Testimony (March 12, 1990), sometimes by appointment and sometimes not.

In Hendricks' expert opinion, Abdulghani was suffering from post-traumatic stress disorder. Hendricks defined the syndrome as "a response by an individual, and this differs from one individual to another individual, to any incident or experience that is life threatening to them at the time." Trial Testimony (March 12, 1990).[2] Hendricks

---

[2] The third edition of the Diagnostic and Statistical Manual of Mental Disorders (hereinafter "DSM-III") defines post-traumatic stress disorder as follows:

The essential feature is the development of characteristic symptoms following a psychologically traumatic event that is generally outside the range of usual human experience. The characteristic symptoms involve reexperiencing the traumatic event: numbing of responsiveness to, or reduced involvement with, the external world and a variety of autonomic, dysphoric or cognitive symptoms.

DSM-III. According to the DSM-III, the diagnostic criteria for post-traumatic stress disorder are:

A. The person has experienced an event that is outside the range of usual human experience and that would be markedly distressing to almost anyone, e.g., serious threat to one's life or physical integrity; serious threat or harm to one's children, spouse, or other close relatives and friends; sudden destruction of one's home or community; or seeing another person who has recently been, or is being, injured or killed as the result of an accident or physical violence.

B. The traumatic event is persistently reexperienced in at least one of the following ways:

(1) Recurrent and intrusive distressing recollections of the event (in young children, repetitive play in which themes or aspects of the trauma are expressed)

(2) Recurrent distressing dreams of the event

(3) Sudden acting or feeling as if the traumatic event were recurring (includes a sense of reliving the experience, illusions, hallucinations, and dissociative [flashback] episodes, even those that occur upon awakening or when intoxicated)

(4) Intense psychological distress at exposure to events that symbolize or resemble an aspect of the traumatic event, including anniversaries of the trauma

C. Persistent avoidance of stimuli associated with the trauma or numbing of general responsiveness (not present before the trauma) as indicated by at least three of the following:

339

found that Abdulghani was suffering from the syndrome because he was experiencing several of the clinical signs:

> He certainly had the nightmares, he had the recurrent thoughts of the plane crashing, and that would happen any time without warning. He would see a plane take off, particularly in the early days, and he would panic; describe himself going into a state of panic. He also, in the course of driving his vehicle, whether or not he was near a plane, he would have moments, he would just panic and felt that he would lose control or something would go wrong with the vehicle and therefore threaten his life and family's life.

Trial Testimony (March 12, 1990). These episodes had never occurred before the crash, and Hendricks believed they were a direct result of the accident and injury Abdulghani received in the airplane crash. See Trial Testimony (March 12, 1990).

Hendricks testified that Abdulghani's personal life had suffered as a result of the crash. He became difficult to live with, and would often experience outbursts directed at his wife and children. In this regard, Hendricks noted that Abdulghani was taking Prozac and Nardil, anti-depressants, Tylenol with codeine, and Ativan, a minor tranquilizer, to decrease the discomfort on a daily basis; these medications, however, offered no hope of permanent improvement. In short, Hendricks stated that Abdulghani was not the same person he used to be, and that this was probably a permanent condition.

---

(1) Efforts to avoid thoughts or feelings associated with the trauma

(2) Efforts to avoid activities or situations that arouse recollection of the trauma

(3) Inability to recall an important aspect of the trauma (psychologenic amnesia)

(4) Markedly diminished interest in significant activities (in young children, loss of recently acquired developmental skills such as toilet training or language skills)

(5) Feeling of detachment or estrangement from others

(6) Restricted range of affect (e.g., unable to have loving feelings)

(7) Sense of a foreshortened future (e.g., does not expect to have a career, marriage, children, or a long life)

D. Persistent symptoms of increased arousal (not present before the trauma), as indicated by at least two of the following:

(1) Difficulty falling or staying asleep

(2) Irritability or outbursts of anger

(3) Difficulty concentrating

(4) Hypervigilance

(5) Exaggerated startle response

340

Cross-examination sought to undermine plaintiff's prospects as a doctor before the accident. The balance of the cross-examination elicited inconsistencies with prior evaluations Hendricks had made. For example, defense counsel sought to show that plaintiff was not incoherent when brought into the hospital. Counsel also directed Hendricks to a report with the notation "no l.o. c.," a medical abbreviation for "no loss of consciousness." Defense counsel sought to show that, although Hendricks had testified that nightmares were an important symptom of post-traumatic stress disorder, Hendricks had said nothing about Abdulghani suffering from nightmares in a deposition taken two years earlier. Trial Testimony (March 12, 1990). Counsel for Seaplane Shuttle also directed Hendricks to a report prepared by Dr. Cicinella concerning plaintiff in the year of the accident; that report likewise contained no mention of nightmares. Trial Testimony (March 12, 1990).

On redirect, plaintiff's counsel clarified Hendricks' testimony. Although Hendricks had testified at the deposition that Abdulghani was not incoherent, he had also stated, at that time, that Abdulghani "was not making a lot of sense." Trial Testimony (March 12, 1990). Hendricks was concerned with the way Abdulghani carried himself, the look in his eyes, the way he was speaking, and "the way he was carrying on." See Trial Testimony (March 12, 1990). Likewise, although the Cicinella report made no mention of nightmares, the third paragraph in the report did state that plaintiff presented initially with symptoms of depression and anhedonia, inability to experience pleasure, and apathy. See Trial Testimony (March 12, 1990).

Plaintiff was next to take the stand. He testified to his relatively humble background; he had worked throughout high school, and was expelled because "he had goofed off one time too many." Trial Testimony (March 12, 1990). His parents were unable to help him through college because of the expense, but he was fortunate and received an academic scholarship that paid for two-thirds of the costs; he paid the balance of the fees from money he earned from different jobs he

---

(6) Physiologic reactivity upon exposure to events that symbolize or resemble an aspect of the traumatic event (e.g., a woman who was raped in an elevator breaks out in a sweat when entering any elevator)

    E. Duration of the disturbance (symptoms in B, C, and D) of at least one month.

    Specify delayed onset if the onset of symptoms was at least 6 months after the trauma.

    DSM-III.

held through college. Although Abdulghani had wanted to be a corporate lawyer, he decided to become a doctor when he discovered, on a visit home, that his mother had refused to see a doctor, even though she was very ill, because she owed the doctor twenty dollars. After a few set-backs, Abdulghani was admitted to an accelerated program within the medical school at Howard University. His grades were good during his first semester, but they dropped during the second semester as he was courting his future wife. Abdulghani continued to hold several jobs during medical school.

After graduation in 1975, Abdulghani took a residency in pediatrics although he had been guaranteed a place in general surgery, his field of choice. Abdulghani testified that he thought that pediatrics was not covered sufficiently in emergency medicine, and he thought it best to start there. After one year, he dropped out of the program. It was too late, however, to start a surgical residency that year, so he studied at the National Institute of Health. He then moved to Atlanta in 1977 to work as "an insurance physical examiner" and as an emergency room physician. Trial Testimony (March 12, 1990).[3] In 1979, he moved to St. Croix, because surgery programs were getting smaller and he would be able to start right away. After passing the Virgin Islands Medical Board exam, plaintiff started to work in the St. Croix emergency room. In 1980–81, he started in the Anna's Hope Detention Center examining in-coming prisoners. He also took a part-time position with the Herbert Griggs Home For the Aged. In 1981, Abdulghani opened a private practice in the Sunny Isle Medical Complex. Although he lost money in his first year, he lost less money in the next two years, made a profit in the fourth year, and in his fifth year he turned a profit and he was "really doing well." Trial Testimony (March 12, 1990). In 1983, he started to work at the methadone clinic, which entailed administering treatment to heroin addicts.

Abdulghani testified that, at this time, he felt as though he had won the New York State Lotto. He testified that it was the first time he was not worried about getting evicted from his home for not paying the rent.

Abdulghani then described the events of the day of the seaplane crash.

He had a seat near the front of the plane that allowed him to see the pilots. As he was reading the Daily News, he felt that the plane

---

[3] There was no objection to this mention of insurance.

was flying in an uncomfortable and strange manner. He looked up and saw the pilots "grabbing levers like drastically pulling, yanking like I've never seen anything like it." Trial Testimony (March 12, 1990). Abdulghani testified that what next occurred was like a nightmare; everyone was quiet, and there was no screaming. See Trial Testimony (March 12, 1990). All he could remember was waking up, still in his seat, with water up to his knees. He unfastened his seatbelt and made his way toward a hole in the fuselage. Although he had taken swimming lessons, he was unable to swim on that day, and felt certain that God had chosen this day for his death:

> I tried to sidestroke. I knew it was maybe a mile. I would get tired if I did the breast stroke. That didn't work. Side stroke wouldn't work, let me try the breast stroke. That wasn't working. I started going down. I know I saw somebody floating past. I tried to float. That didn't work. And then it hit me that today is the day that you're not getting out of this one, and it was like—a slap in the face. You are going to die, you know. You thought you were going to St. Thomas for a passport for your son but really God wanted you to die today.

Trial Testimony (March 12, 1990).

The next thing that Abdulghani remembered was that he was floating in the water. He sank below the surface three times, and then a law clerk who had been a passenger on the same plane pulled him to a broken part of the plane's wing. When the wing broke off, he held onto a floating cushion. A boat came soon thereafter. As he climbed into the boat, he noticed that he had a severe headache; although Abdulghani could not remember hitting his head, he thought that he must have, and that he must have been unconscious. As the boat mounted each wave on the way to shore, plaintiff felt as though someone was hitting him, and, even though they were not far from shore, it felt as though it took a long time to get there. See Trial Testimony (March 12, 1990).

Upon reaching the shore, he was taken to the hospital in a police car. Once there, he received sutures on his right leg, x-rays for his right wrist and right ankle, and a skull series. He did not want to stay because he thought they should take care of other people. He left the hospital even though they had asked him to stay. When he arrived at home that day, his adrenalin ran out and he collapsed; he remained at his house for a week or two. Abdulghani testified that he was unable to do anything during this time because of intense head-

aches in the front of his forehead. He attributed this condition to his brain hitting the front of his skull in the accident.

When Abdulghani eventually returned to work, things did not go well. His hand was not the way it had been, and he no longer trusted it in an emergency situation. A cast was placed on his hand, and he finally recognized that it was too dangerous for him to keep working. Plaintiff underwent electrical therapy for his wrist, although this was not entirely successful; it only partially reduced the pain. Trial Testimony (March 12, 1990). Abdulghani testified that he still has some pain today. Abdulghani scaled down his private practice, because he felt that he had lost his professional distance and judgment. In this regard, Abdulghani testified as follows:

> Every time people came to me with their problems, I would feel the way they felt. All of a sudden I was no longer a doctor anymore. I was like, if you came and said you had a headache, I would feel the pain you had with a headache. I couldn't make the right decisions for you. I would give you anything to let your headache go. My judgment was impaired.

Trial Testimony (March 12, 1990). Abdulghani closed his private practice completely on March 1, 1987.

At home, Abdulghani no longer trusts his own emotions. While once he was even-handed and patient with his children, they are now afraid of him. He has become an ogre, and can no longer control himself. He has tried several medications, psychotherapy, and dream interpretation; none has helped. He currently takes Prozac, an antidepressant, to keep from committing suicide. See Trial Testimony (March 12, 1990).

On cross-examination defense counsel first questioned plaintiff about his income tax returns. He then reviewed plaintiff's actions after the accident. For example, on the day of the accident, plaintiff had set out to obtain a passport for his son. After he was released from the hospital, plaintiff proceeded to obtain the passport.

Defense counsel also confronted plaintiff with a prior statement to the effect that he had stopped working six weeks after he had resumed working because "it was not advantageous for me." Trial Testimony (March 12, 1990). Plaintiff did not deny that he had made the statement, but he did not have the opportunity to explain fully what he had said.

Defense counsel also brought out the fact that plaintiff had been on planes since the seaplane crash. Plaintiff admitted that he had

flown to Iran, via Venezuela, and to New Jersey. Abdulghani had flown to Iran to pray for an end to the suffering he had endured since the accident; he was required to fly through Venezuela in order to obtain a visa to travel to Iran. Abdulghani testified that he met with Ayatollah Kholmeini while there. He also explained that he had flown to New Jersey to visit his father, who was very ill at the time.

Dr. Sidney Merin, an expert in neuro-psychology and clinical psychology, was the next witness. He testified that plaintiff had suffered organic brain damage in the plane crash. Dr. Merin's findings were based on a series of tests he had performed, which tests included an Intelligence Quotient ("IQ") test. Dr. Merin's findings were used and relied upon by Dr. Hendricks, and helped to explain some of the difficulties Dr. Hendricks had faced in treating Abdulghani.

Plaintiff next called Dr. Martin Blinder. After reviewing his extensive credentials and national reputation, counsel for plaintiff offered Dr. Blinder as an expert in psychiatry. There were no objections to his qualifications. Dr. Blinder testified that he had examined Abdulghani on two occasions and reviewed plaintiff's medical records as well as the notes and reports of his treating psychiatrists. Dr. Blinder stated that Abdulghani's emotional injuries were debilitating; he stated that even the give and take of daily intercourse was too much for Abdulghani. See Trial Testimony (March 13, 1990). Dr. Blinder further testified that, in his opinion, the prognosis for future improvement in plaintiff's condition was not good; he suggested that Abdulghani's mental state might even decline. See Trial Testimony (March 13, 1990). Dr. Blinder, who had worked in emergency rooms, also testified that Abdulghani was unlikely ever to work again as a physician, or in any field that would be intellectually demanding.

Cross-examination did not seriously undermine any of Dr. Blinder's testimony.

Lawrence Foreman, a vocational rehabilitation expert, next testified as to plaintiff's inability to work in a stressful environment. Foreman explained that plaintiff was able to continue to work in the methadone clinic because his responsibilities were clerical. Plaintiff presented evidence that the clinic was required to have a physician associated with it in order to receive federal funding. Foreman testified that plaintiff was required only to sign prescriptions for methadone after a nurse had prepared the forms. In short, plaintiff's duties were ceremonial rather than substantive.

Cross-examination was brief and of no consequence.

Plaintiff's final witness was Lawrence Roberts, an expert in economics, who testified as to the value of plaintiff's lost earning capacity. At the time of the crash, Abdulghani held three jobs. As an emergency room physician, he was earning $36,981 a year. He earned $15,000 more at a methadone clinic, and an additional $12,000 at the Griggs Home for the aged. Finally, plaintiff earned $29,168 from his private practice in the year of the crash. Roberts used the prevailing salaries of the hospital and retirement home positions and an estimate of plaintiff's income from his private practice as a basis for determining the lost earning capacity. Roberts testified that in 1990 the clinic position would have paid $59,199. The Griggs Home would have paid $12,000. Finally, Roberts testified that earnings from private practice in 1990 would have been equal to $53,410. After making several adjustments to account certain variables, including, for example, a $10,000 increase in the government position and plaintiff's 26 year work life expectancy, Roberts testified as to the projected earnings from these positions over plaintiff's work life expectancy. According to Roberts, the emergency room position would have paid plaintiff $3,346,883 over the span of his work life expectancy, the retirement home would have paid $861,806, and plaintiff would have earned $4,843,135 in private practice. Thus, the gross loss sustained by Abdulghani was $9,051,824, although Roberts did not give total the gross lost earnings for the jury.

Roberts then testified as to what each component of future lost earnings would be if reduced to present value. The present value of $3,346,883 figure for the emergency room position was $1,184,358, the $861,806 figure for the retirement home would be reduced to $312,000, and the $4,843,135 for private practice income would be reduced to $1,641,266. The total present value of plaintiff's lost earning capacity, according to Roberts, was $3,137,624. Roberts did present this figure to the jury.

With respect to the calculation of present value, the testimony of Professor Roberts was as follows:

Question: Could you explain to the jury why you, why we are required to reduce it to present value and the mechanism you used to reduce it to present value?

Answer: The why is that obviously, let's take the medical figure, obviously if he had not been injured and able to work as an emergency room physician, he wouldn't receive today three million, three hundred and forty six thousand eight hundred and eighty

346

three dollars. That this would be something that would come to him over a period of the 26 years, and in the way that the contract is set up, he would receive it once every two weeks. So you have then 26 pay periods a year over a period of 26 years.

Trial Testimony (March 13, 1990).

Professor Roberts made the following statement in connection with the adjustments he made to arrive at the present value of plaintiff's lost earnings:

Answer: Based upon the understanding, the probability is that these wages will not be frozen at today's levels as they haven't been at the past, so in making adjustments for probable upward trends ... this is an average annual increase of over, well over 12 percent a year on average. But again, I didn't project that, just an example of what the terms are.

Trial Testimony (March 13, 1990).

Professor Roberts further testified:

So therefore, after the sixth year, the sixth year I had my computer put in the exact amount, but then after the sixth year I asked the computer to increase that at a rate of approximately 1.3 percent higher than the rate at which I would be discounting. It's the reason for that, the long run history of doctors' pay in the United States has shown that to be the, the average doctor's pay had increased at least that much over the discount rate that my methodology used ...

Question: How did you reduce it to present value?

Answer: That is how I did it. And that's what's reduced to present value—what effect interest rates 1.3 percent higher than my computer to pick it up, the present value of that, then perhaps just label this PV, the present value of that becomes $1,184,358. That would be the present value that would create that flow ...

Trial Testimony (March 13, 1990).[4]

Cross-examination did not draw out the inflation, interest, or discount rates, nor did the defense present its own analysis of the figures to be used for reducing any award. Instead, defense counsel sought to show that Roberts was biased because he received all of his income from expert witness fees. Defense counsel next highlighted

---

[4] Professor Roberts was using a display board during his testimony.

347

that Professor Roberts had assumed that plaintiff had a total disability with respect to the emergency room, the retirement home, and the private practice. Professor Roberts stated that he had not included within his calculations any of the income from the methadone clinic because plaintiff was still working there. Defense counsel sought to show that Abdulghani might not have earned as much as Roberts had depicted as his capacity to earn. Cross-examination then focused on plaintiff's expected retirement age. Cross-examination also focused on a relatively small component of plaintiff's private practice income.

At this point, plaintiff rested. Defendant put the following evidence before the jury. Defendant first offered two fact witnesses, Kathleen Gilliam Madden and Luz Belez-Lawton, who both saw Abdulghani at various times shortly after the accident and thought that he was not different than he had been before the accident.

Defendant's next witness was Dr. Rafael Toboas, who was qualified as an expert in neuro-ophthamology and in neurology. See Trial Testimony (March 13, 1990). On direct examination, Dr. Toboas testified that his examination of plaintiff had not disclosed the loss of visual acuity which would normally accompany a neurological injury. He therefore concluded that Abdulghani had not suffered any brain damage from the plane crash. On cross-examination, Dr. Toboas conceded that his tests might not disclose organic brain damage, and that it was possible in fact that Abdulghani suffered from organic brain injuries.

Eileen Huggins and Alda Forte, who both worked with Dr. Abdulghani at the retirement home, testified in general terms that plaintiff had been able to perform various functions after the accident. Plaintiff's counsel sought to show that plaintiff's work had been highly regarded and that he was well liked.

Leonard Chasen, a certified public accountant testified that plaintiff's income records were incomplete, and that it was difficult to estimate his income based on the available records. On cross-examination, however, Chasen was shown four business archive boxes, each about 18 inches by 24 inches, filled with various records from plaintiff's private practice. Chasen was asked whether he had reviewed or examined any of these records. He responded that he had not. He was also asked whether counsel had told him that they were available for his examination. His answer indicated that he was unaware of their existence. See Trial Testimony (March 13, 1990).

348

The next witness was Dr. Eric Mitchell, who was admitted as an expert in orthopedics. Dr. Mitchell testified to the lack of serious injuries; he found no evidence of any fractures, and found that there were no structural abnormalities or even scars to be found. Trial Testimony (March 14, 1990). Mitchell concluded that there were no physical injuries that prevented Abdulghani from practicing emergency medicine.

Dr. John Gordon was the final witness to take the stand. He was admitted as an expert in clinical psychology and neuro-psychology. He stated that, in his expert opinion, Abdulghani had not suffered any organic brain injury as a result of the plane crash.

The defense then rested, and defense counsel objected to the inclusion of an instruction on lost future earnings on the following basis:

> Mr. Zeehandelaar: All the proofs are in and in light of the completion of the proofs I am asking the court to not charge the jury on loss of earning capacity. And the reason is because the law is that a jury must, if they are to award loss of future earning capacity, must make adjustment for present value of that money by making some consideration of interest rate period of time for future loss to be sustained and then reduction for present value. There has been no testimony, frankly, your honor, and it is the burden on the plaintiff to offer such testimony on such subjects.

> I in fact asked the court to limit the economic testimony to present value[5] which would, frankly, have eliminated objection and the court properly under the law, you are to do that, allowed to give the full amount and explain to the jury how to get to present value. It was not given. I believe the proofs are lacking.

> Therefore I believe the charge cannot be charged where there is no proof.

> The Court: Let me hear from plaintiff.

> Mr. Alcon, are you going?

> Mr. Alcon: Yes, your honor.

> Our qualifying economist explained to the jury how the man he took to the age of 68. It's in the record.

---

[5] When Roberts took the stand, he had with him a display board. That display listed the gross figures for plaintiff's projected lost earnings in smaller print listed the reduced figures. Defense counsel objected to the use of this chart because the figures disclosed in discovery had been the reduced figures. The court ruled that Roberts could not use the chart because the non-reduced figures were in larger print and therefore likely to mislead the jury.

He gave him—on the way up he said there would be economic losses in his opinion, and he took the figure out to nine million dollars and told the jury that pursuant to the court's instruction—the court very directly then told the jury that that figure had to be reduced to present value taking into account interest at present worth and said the actual—the earning capacity has been reduced to present value. He gave the figures for the jury. They chose not to give any other assistance to the jury and the jury can adopt it as their own.

The Court: Are you saying it is not necessary for your witness to put forth a specific rate of interest as well as a specific rate of inflation?

Mr. Alcon: Right. In this court we don't use inflation at all.

Trial Testimony (March 14, 1990).

The court then ruled that the future lost earning capacity question could be submitted to the jury. After closing arguments, the jury was given the following charge on reducing any award to its present value:

If you should find that the evidence in the case established either: (1) a reasonable likelihood of future permanent disability, or (2) a reasonable likelihood of loss of future earnings, then it becomes the duty of the jury to ascertain the present worth in dollars of such future damage, since the award of future damages necessarily requires that payment be made now for a loss that will not actually be sustained until some future date.

Under these circumstances, the result is that the plaintiff will in effect be reimbursed in advance of the loss, and so will have the use of money which he would not have received until some future date, but for the verdict.

In order to make a reasonable adjustment for the present use, interest free, of money representing a lump sum payment of anticipated future loss, the law requires that the jury discount, or reduce to its present worth, the amount of the anticipated future loss, by taking (1) the interest rate or return which the plaintiff could reasonably be expected to receive on an investment of the lump sum payment, together with (2) the period of time over which the future loss is reasonably certain to be sustained; then to reduce, or in effect deduct from the total amount of anticipated future loss whatever that amount would be reasonably

350

certain to earn or return, if invested at such rate of interest over such future period of time, discounted by the expected rate of inflation; and include in the verdict an award only for the present worth—the reduced amount—of anticipated future loss.

Trial Testimony (March 14, 1990).

After approximately two hours of deliberations, the jury returned with an award of $5,500,000. Defendant then filed a timely motion for new trial or for remittitur.

## III. DISCUSSION

Defendant argues that it was improper to allow the jury to consider the testimony of plaintiff's economic expert because he failed to testify as to the intermediate steps used in reducing plaintiff's future lost earnings to their present value. Specifically, defendant argues that it was error to submit future lost earnings to the jury where the instruction in connection with this element of damages required the jury to consider inflation and interest rates in reducing its award to present value and plaintiff presented no evidence as to the inflation or interest rates. Plaintiff counters that sufficient evidence was presented. Upon reconsideration of this issue, the court concludes that it was error to submit this element of damages to the jury.[6]

■ The Third Circuit has held on numerous occasions that "[t]he plaintiff . . . bears the burden of proof and it is the responsibility of the plaintiff to provide for the jury some evidentiary and logical basis for calculating or, at least, rationally estimating a compensatory award." Huddell v. Levin, 537 F.2d 726, 743–44 (3d Cir. 1976). Accord Ballantine v. Central Railroad of New Jersey, 460 F.2d 540 (3d Cir.), cert. denied, 409 U.S. 879 (1972); Haddigan v. Harkins, 441 F.2d 844 (3d Cir. 1970); Russell v. City of Wildwood, 428 F.2d 1176 (3d Cir. 1970). Put alternatively, "the law of this circuit places the burden on the plaintiff to produce evidence permitting a rational reduction to present value." Gorniak v. National R.R. Passenger Corp., 889 F.2d 481, 486 (3d Cir. 1989). The defendant has no burden to produce

---

[6] It is impossible to separate that portion of the award that was attributable to pain and suffering and that portion relating to loss of earning capacity because of the general verdict rendered. Accordingly, the error on this issue requires that plaintiff retry the entire case.

such evidence. DiSabatino v. National R.R. Passenger Corp., 724 F.2d 394, 396 (3d Cir. 1984).

The discussion of the various methods for reducing an award of future lost earnings in Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523 (1983), is instructive. In Jones & Laughlin Steel, the Supreme Court held, in a decision limited to the context of Section 5(b) of the Longshoreman's and Harbor Workers' Compensation, 33 U.S.C. § 905, 462 U.S. at 547, that the Third Circuit had erred in adopting a total offset rule to be applied as a matter of federal law for determining future lost earnings in such cases. Id. at 551–52. After surveying the leading theories of present value reduction, the Supreme Court concluded that the district court was free on remand to choose whatever rate to discount the future earnings stream so long as there was a deliberate choice rather than a mistaken belief that a rule of state law was controlling.

In so holding, the Supreme Court declined the invitation of the litigants and several amici curiae to select and establish "for all time as the exclusive method in all federal trials" one method for reducing future lost earnings to present value. Id. at 547. It is the Supreme Court's discussion of the theories of present value reduction that is relevant here. The Supreme Court identified three basic approaches to the difficulty in reducing awards for future losses to their present value: the "real interest rate" approach, the "market interest rate" approach, and the "total offset" approach. See id. 541–46. The Supreme Court defined the real interest rate approach in this manner:

> [some courts] have endorsed the economic theory suggesting that market interest rates have two components—an estimate of anticipated inflation, and a desired "real" rate of return on investment—and that the latter component is essentially constant over time. They have concluded that the inflationary increase in the estimated lost stream of future earnings will be perfectly "offset" by all but the "real" component of the market interest rate.

Id. at 542. In non-economic terms, this body of economic thought considers interest payments to represent two elements. One aspect of market interest represents compensation for the amount that inflation will devalue the investment in the future; this is the "estimate of anticipated inflation." The other component is a payment to the investor for the use of the money over time, and represents that "real rate of return." This rate of return is, of course, significantly

smaller than the market rate paid. According to this view, it is unnecessary to consider inflation when reducing an award to present value, because the interest rate already incorporates inflation. Instead, it is necessary to discount the future lost earnings by the real interest rate, which is traditionally estimated to be approximately two percent. Id. at 541–42 (citing, inter alia, Doca v. Marina Mercante Nicaraguense, S.A., 634 F.2d 30, 39–40 (2d Cir. 1980) (authorizing district court judges to use two percent rate where parties elect not to offer evidence)).

The Supreme Court also referred to the market rate approach, 462 U.S. at 543, under which the parties are permitted to present experts on the effect of future inflation and market interest rates. The jury is then instructed to make its own determination of the rate it must use to reduce future losses to their present value. E.g., Huddell, 537 F.2d at 743 (citing Tenore v. Nu Car Carriers, Inc., 67 N.J. 466, 481–84, 341 A.2d 613, 621–23 (1975) ("What we do expect is that the experts will provide the jury with their analyses of trends in future wage increases and discount interest rates generally and that then, giving due regard to credibility, the jury will use those trends and rates in arriving at their own independent single-figure appraisal of plaintiff's pecuniary loss")).[7]

In the instant case, the parties elected to proceed with a charge modelled after the market interest rate approach.[8] Although counsel for plaintiff was correct when he argued at trial that it is not necessary for every plaintiff who seeks an award for future lost earnings to present evidence concerning inflation rates, in this case the

---

[7] The Supreme Court finally reviewed various offset methods under which the effects of inflation offset the ideal discount rate. Id. at 544 ("the ideal discount rate . . . is . . . completely offset by certain elements in the ideal computation of the estimated lost stream of future income"). The total offset approaches have no bearing on the trial of this case.

[8] Defendant's requests for charge included a market interest rate charge on present value reduction. Defendant Virgin Islands Seaplane Shuttle, Inc.'s Proposed Jury Instructions at 10. Plaintiff's request for charge challenged defendant's request only on the ground that it did not include any instruction that the jury should also consider inflationary trends. Plaintiff's Proposed Jury Instructions at 7–8. The instruction given to the jury included the inflationary trend instruction, and neither party objected to the form of the charge. That the parties agreed on the theory of the charge also precludes the possibility that plaintiff's failure to present evidence was caused by surprise. Moreover, defense counsel's repeated objections, necessary to preserve this issue, further placed plaintiff on notice of his obligation to present evidence on inflation and interest rates.

parties elected to proceed with a charge which required such evidence, and the burden was on plaintiff to introduce it. Consistent with the market interest rate theory reducing for future awards, the jury was essentially instructed to consider expected interest rates and the adverse effects of inflation in calculating the present value of Abdulghani's future lost earnings. The parties chose an instruction that required the jury to consider inflation and interest rates. Therefore the plaintiff in this case was obligated to present evidence concerning inflation and interest rates.

Plaintiff failed to meet this obligation. Although Roberts testified to a 1.3 percent discount rate, this testimony was geared toward the real interest rate approach, a method on which the jury was not instructed. In short, the jury was instructed to consider inflation and interest rates, and plaintiff failed to present any evidence as to inflation or interest rates, the two variables in the market rate theory of reduction to present value. Accordingly, the court is compelled to conclude that the proofs were lacking.

Professor Roberts may have conveyed to the jury the general contours of the concept of present value. Likewise, the reduction of the gross figure to the discounted figures may have served as examples of the kind of results obtained by using a formula to arrive at present value. He did not, however, provide information as to interest rates or inflation rates that would have allowed the jury rationally to perform its own analysis.

In Russell, the jury was "given no guide, whether by way of mortality tables, expert testimony or otherwise, as to the way in which [it] should determine the present value of plaintiff's alleged loss of future earnings." 428 F.2d at 1179. Accordingly, the Third Circuit held that plaintiff had failed to carry his burden of proof:

> [T]here was no evidence as to what interest could fairly be expected from safe investment which a person of ordinary prudence, but without particular financial experience and skill, could make, nor was any guidance given to the jury as a basis of that interest rate, the present value of the plaintiff's total future earnings loss as determined by them. The determination of the appropriate interest rate and the computation of present value on the basis of it involved facts and mathematical procedures of which the jurors could not be assumed to have personal knowledge from their own prior experience. They were, therefore, entitled to receive evidence and appropriate mathematical guid-

354

ance with respect to these matters if they were to act rationally and not upon mere conjecture or guess.

*Id.* at 1183. Thus, "[g]uidance as to the mathematical computation could have been through the testimony of a mathematical expert or through tables or formulas of which the court could have taken judicial notice." *Id.*

Section 913A of the Restatement (Second) of Torts provides that "[t]he measure of a lump-sum award for future pecuniary losses arising from a tort is the present worth of the full amount of the loss of what would have been received at the later time." Comment B to this section further states that the reduction process "is complicated and may appropriately be explained by the utilization of present-worth tables, . . . paid at regular intervals over a designated period of time and calculated at a particular interest rate." (emphasis added). The Restatement does not *require* the use of such tables. They are simply one technique that may be used to aid the jury in reaching its determination.

■ It is clear, however, that plaintiff must produce some method which allows the jury to make a computation. This can be either in the form of table or in the form of testimony as to the inflation and discount rates. Although plaintiff need not introduce both types of evidence to the jury, the failure to produce one or the other is fatal. In this case, no table was presented. The only basis was Roberts' testimony, and therein the only aid to the jury was his comparison between the gross figures and the reduced figures. The court finds that this was insufficient as a matter of law.

In Ballantine, the Third Circuit held that the jury had not been sufficiently instructed as to present value when the court gave the following instruction:

> If we assume that a debtor will owe me a dollar one year from today and he hands me the dollar now, when the debt is not due, I can invest the dollar and to the end of the year when the debt is actually due I will actually have received $1.06, 6 cents more than the debt. Therefore, if he wishes to discharge the obligation now rather than wait until the end of the year, the debtor will hand me approximately 94 cents. Then, when I invest that sum at 6 percent interest I will have the full amount of the debt at the end of the year.
>
> In such a case as I have given you the 94 cents would be the present worth of the dollar due. This is precisely the process

which is involved when you come to an award and award lost earnings in the future.

460 F.2d at 542 n.5. The testimony in the instant case is virtually identical, in that plaintiff asserts that mere analogy is sufficient. It is not. Roberts' general explanation of the reason for present value reduction did not provide the jury with a sufficient basis for reducing the award to its present value. This error requires a new trial.

## CONCLUSION

■ The court recognizes the substantial nature of the award in this case and the significance of this decision. After a careful review of the trial proceedings and the evidence presented, and for the foregoing reasons, the court is compelled to grant defendant's motion for new trial. The court does not reach at this time the other issues raised by defendant, and the case will be listed for a new trial at the earliest available trial date.

An appropriate order will be entered.

## ORDER

This matter having come before the Court on the motion of defendant Virgin Islands Seaplane Shuttle Inc. for new trial or remittitur pursuant to Fed. R. Civ. P. 59(a); and

The Court having considered the submissions of the parties and having heard the arguments of counsel at a hearing on June 8, 1990; and

For the reasons set forth in the Court's opinion of this date;

IT IS on this 23d day of August, 1990 hereby

ORDERED that defendant's motion IS GRANTED and it is further ORDERED that a NEW TRIAL BE HELD at a date to be set by the court.

No costs.