**Peter McKENNA, et al.**

v.

**PACIFIC RAIL SERVICE.**

**Civ. A. No. 91–693.**

United States District Court,
D. New Jersey.

March 29, 1993.

499

Louie Nikolaidis, Thomas M. Kennedy, Daniel E. Clifton, Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, P.C., East Rutherford, NJ, for plaintiffs.

James L. Sonageri, Sonageri & Howley, Hackensack, NJ, for plaintiff Anthony Nazare.

Roger D. Meade, Littler, Mendelson, Fastiff & Tichy, Baltimore, MD, Liza Walsh, Connell, Foley & Geiser, Roseland, NJ, for Pacific Rail Service.

POLITAN, District Judge.

This matter comes before the court on the following motions: (1) defendant's motion for judgment as a matter of law on the issue of liability pursuant to Fed.R.Civ.P. 50(b); (2) defendant's motion seeking a new trial, or in the alternative, for judgment as a matter of law on damages or for remittitur; (3) plaintiffs' motion for prejudgment interest; (4) plaintiffs' application for attorneys' fees and (5) plaintiff Nazare's motion to vacate his dismissal from the Complaint. For the reasons outlined herein, defendant's motion for judgment as a matter of law on the issue of liability is **DENIED**; defendant's motion seeking a new trial is **DENIED**; defendant's motion seeking judgment as a matter of law on the issue of damages is **GRANTED WITH RESPECT TO FRONT PAY**; plaintiffs' motion for prejudgment interest is **GRANTED**; plaintiffs' application for attorneys' fees is **GRANTED IN PART AND DENIED IN PART**; and plaintiff Nazare's motion to vacate his dismissal from the Complaint is **DENIED**.

### BACKGROUND

On January 4, 1991, twenty-eight (28) individual plaintiffs filed an action in the New Jersey Superior Court, Law Division, against defendant Pacific Rail Service ("Pacific Rail") alleging age discrimination against plaintiffs in violation of the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. § 10:5–1, et seq. Plaintiffs claimed that Pacific Rail failed and refused to hire them because of their age. Thereafter, defendant removed the action to this court on diversity grounds.

Ten of the twenty-eight plaintiffs who had initiated this litigation have been dismissed from the case. One plaintiff whose claim was dismissed for failure to prosecute this matter, Anthony Nazare, has filed a motion to vacate his dismissal. This opinion addresses only Nazare's motion and the claims of the remaining eighteen plaintiffs. Plaintiffs' claims on liability, as tried before the jury, can be outlined as follows:

Consolidated Rail Corporation ("Conrail") operated an intermodal facility for the transportation, loading and unloading of freight at 6201 Tonnelle Avenue, North Bergen, New Jersey ("North Bergen terminal"). In the period from 1960 to September 1, 1990, lift operations at the North Bergen terminal were performed by employees of Pennsylvania Truck Lines, Inc. ("PTL"). PTL employees also performed lift operations at a Conrail intermodal facility in South Kearny, New Jersey. PTL was a wholly-owned subsidiary of Conrail until sometime in 1990, when a group, including certain PTL managers, purchased PTL in a leveraged buy-out.

Plaintiffs are former employees of PTL who worked as yard or clerical employees at the North Bergen terminal. All of the plaintiffs were over 40 years old as of August 1990. Many of the plaintiffs worked for PTL or its predecessor corporations for more than 30 years.

In June 1990, Conrail requested bids for its lift operations at the North Bergen terminal. Among the bidders was Pacific Rail. At the time, Pacific Rail was one of the largest independent intermodal operators in the United States. In or about mid-August 1990, Conrail awarded the bid to Pacific Rail.

Prior to September 1, 1990, Pacific Rail sought applicants to staff the North Bergen terminal. Jerry McCormick, a Pacific Rail Terminal Manager in Elizabeth and the fu-

ture Pacific Rail Terminal Manager at North Bergen, was the person responsible for hiring individuals to work at the North Bergen terminal.

Shortly after Pacific Rail won the bid for the North Bergen lift operations, Peter McKenna, the shop steward for the North Bergen yard employees, informed Jerry McCormick by telephone that the North Bergen yard and clerical employees were willing to work for Pacific Rail. McKenna asked McCormick to supply the North Bergen employees with job applications. On August 20, 1990, McCormick went to the North Bergen yard and gave McKenna blank job applications. McKenna distributed the job applications to the North Bergen PTL employees.

On Friday August 24, 1990, McKenna returned approximately 25 completed applications from the North Bergen yard and clerical work force to McCormick. At that time, McKenna requested additional applications from McCormick. McKenna asked McCormick to return to the North Bergen terminal on the following Monday, August 27, 1990, to pick up the remaining completed applications. McCormick did not return, however, and on September 1, 1990, R. Michael List, the Pacific Rail Assistant General Manager, gained possession of the remaining job applications completed by North Bergen PTL employees.

Prior to September 1, 1990, aside from accepting some of the completed job application forms from McKenna, Pacific Rail made no effort to contact the North Bergen PTL yard or clerical employees concerning possible employment with Pacific Rail, even though Pacific Rail knew that the PTL employees desired to work for Pacific Rail. Nor did Pacific Rail make any effort to gain timely possession of the second group of completed applications.

List testified at trial that the only reason for the decision not to hire the former North Bergen PTL employees was the individual work habits and attitudes of those individuals. There is no evidence in the record, however, to indicate that Pacific Rail ever evaluated the individual work habits and attitudes of the former North Bergen employees. Nor is there any evidence in the record,

aside from certain comments made by McCormick, that Pacific Rail had before it any information about the applicants from PTL in North Bergen apart from the responses in the perfunctory applications and, most importantly, the ages of the applicants.

Prior to September 1, 1990, Pacific Rail hired 13 yard employees and 8 clerks to staff the North Bergen operation. None of the individuals hired were former North Bergen PTL employees. Seventeen of the twenty-one people hired were under the age of 40. Subsequent to September 1, 1990, Pacific Rail hired four additional yard employees. All were under 40. No additional clerks were hired after September 1, 1990. In total, 21 of 25 clerical and yard employees hired by Pacific Rail were under 40 years old.

After September 1, 1990, John Gittens, a former PTL supervisor hired by Pacific Rail, recommended four former PTL North Bergen yard employees to be considered for employment: Ralph Angolemmo, Joe Armetta, Anthony Nazare and Richard Montacalvo. Angolemmo and Armetta were in their 20s and Nazare and Montacalvo were over 40. Pacific Rail hired Angolemmo and Armetta but did not hire Nazare and Montacalvo. Armetta and Angolemmo were two of the less qualified North Bergen PTL yard employees.

Ed Cifune, who was employed in a supervisory capacity for PTL at the North Bergen terminal from 1984 to 1990, testified at trial. From 1987 to 1988, Cifune was the Assistant Terminal Manager and from 1988 to 1990 he was the Terminal Manager at North Bergen. Cifune gave the clerks and yard employees high marks for their work habits and attitudes. For example, PTL had established Quality Circles in which a number of employees participated. The North Bergen workers had good attitudes and "they realized the importance of their job[s]." The clerks were "well versed" in procedures. The PTL–North Bergen clerks "would go the extra mile to get the work done." From 1984 to 1990, the number of clerks in North Bergen decreased from 12 to 7, yet the work load increased. Cifune testified that "[y]ou didn't

have to worry about the clerks, they knew their job and they did it." Cifune rated the work ethic of the PTL clerks in North Bergen favorably as compared with the work ethic of the clerks at the South Kearny terminal. The North Bergen clerks worked "more efficiently" than the South Kearny clerks.

There was testimony that the yard employees were also proficient in their jobs. They "knew [their jobs] and they knew what [the jobs] entailed." The yard employees were complimented by supervisors on the quality of their job performance.

Each of the plaintiffs was rated positively by his or her supervisor:

1) Jeanette McCafferty—"She was an excellent worker."

2) Ralph Fernandez—"He was a very meticulous worker."

3) Phyllis Lindh—"She was always diligent in her job."

4) Paul Noethe—"He saved Conrail in one instance alone fines of roughly $10,000 a trailer [for] 19 trailers they were asked to trace. I think that, in itself, speaks of [the] quality of his work."

5) Sal Petruzzelli—"He was an excellent worker."

6) Ed Dechert—"He did his job the way it was supposed to be done."

7) Pat Burwitz—"She was very helpful and instrumental."

8) Mike Demone—"He did an excellent job."

9) Peter McKenna—"An excellent worker.... He always did his job."

10) Gregory Spina—"Spina was an excellent packer operator." He was called "Mr. Wonderful" by the Terminal Manager Milarski.

11) Jack Ricciardi—"He always did his job. He never shirked."

12) John Oliver—He was helpful in "getting the trains out on time."

13) Pincus Cohen—"He was particularly helpful when programming a train."

14) Bill Harper—"An excellent worker.... He never said no."

15) Dorrance Lindh—He "was as helpful as Mr. Cohen and the others on the shift in getting the trains out on time."

16) John Shea—"He was one of the first to pick out any defects that might exist."

17) Bob Tighe—"An excellent worker. He always gave 100 percent."

18) Dennis McCarthy—"When you needed him and made a phone call, he was there."

From 1984 to 1990, many concessions were agreed to by the North Bergen employees to make the employer more efficient. During that period, the yard work force decreased by one-third while the volume increased by 14%. From 1984 to 1990, the cost of the yard operation at North Bergen also decreased from approximately $23 per lift to $7.25 per lift. In 1990, the cost of the yard operation at South Kearny was approximately $7.75 per lift.

Moreover, the PTL North Bergen operation was more efficient than the PTL South Kearny operation. The North Bergen yard averaged 9,200 lifts per month. The South Kearny yard averaged 25,000 lifts per month. The South Kearny yard had approximately 100 employees on the seniority list with approximately 70 yard employees working on the lift operation on a daily basis. South Kearny had over three times the daily yard employees of North Bergen, yet the South Kearny yard performed only approximately 2-½ times the lifts as North Bergen. Therefore, the lift per man hour rate was lower at South Kearny than at North Bergen.

Cifune testified that at the North Bergen facility "99% of the time the departure of the trains [was] on time." According to Cifune, the few times the trains were delayed was the result of scheduling problems. From 1984 to 1990, delays caused by the work force occurred no more than three or four times.

In July 1990, PTL and the union entered into a Supplemental Agreement to increase the efficiency of the North Bergen operation. Implementation of the Agreement would have eliminated past practices at the facility and, as a result, would have reduced the cost

of the yard operation by between $1.00 to $1.25 per lift. One yard position was immediately eliminated upon signing of the Agreement. Full implementation of the July 1990 Agreement would have reduced the yard crew from 19 to 15 employees. The projected productivity of the PTL North Bergen yard operation with a fully implemented Supplemental Agreement would have compared favorably to the productivity of the Pacific Rail North Bergen operation after September 1, 1990. After September 1, 1990, Pacific Rail employed 17 yard employees. There is evidence in the record that the volume of lifts performed by Pacific Rail decreased by 7% compared to the volume of lifts performed by PTL.

Pacific Rail did hire a number of former PTL South Kearny employees, including Tim Byrne, James Flynn, Michael Krommenhoek, Thomas Krommenhoek and Jorge Velez. These former South Kearny PTL employees had disciplinary problems. Michael Krommenhoek and Thomas Krommenhoek were discharged three weeks after they were hired by Pacific Rail.

To support their case, plaintiffs attempted to designate a statistical expert after the close of discovery. Magistrate Judge Ronald J. Hedges determined that plaintiffs' attempted late designation of a statistical expert would be treated as a motion to amend the Pretrial Order. The resulting motion to amend was later denied by the Magistrate Judge. His Order was affirmed by this Court in an unpublished Letter Opinion and Order dated July 29, 1992.

As to their claim for damages, plaintiffs' Complaint included a "Demand For Relief" in which they prayed that Pacific Rail Services be ordered "to offer employment to plaintiffs and make them whole for all wages and benefits lost by reason of defendant's unlawful discrimination."[1] Plaintiffs did not request front pay as a separate, or alternative, element of damages.

In the Pretrial Order entered in this proceeding, plaintiffs included two assertions of fact concerning what they intended to prove on the issue of damages. These included:

36. As a result of defendant's actions, plaintiffs have lost income and otherwise suffered the effects of discrimination on account of age.

37. As a result of defendant's actions plaintiffs have been caused emotional distress.

Plaintiffs never sought to designate any expert to testify as to damages. Judge Hedges ordered stricken from the Pretrial Order plaintiffs' claim for emotional distress damages. The Magistrate further ordered plaintiffs to quantify their damages by March 16, 1992. Plaintiffs never complied with this latter order by Judge Hedges.

As part of their pretrial submissions to the Court, the plaintiffs filed and served upon the defendant a Trial Memorandum. The memorandum described this case as one in which plaintiffs sought "a judgment ordering defendant to offer them employment and to pay back wages, compensatory damages, punitive damages and attorneys' fees." Plaintiffs concurrently submitted proposed Jury Charges, among which were included a number of instructions dealing with "emotional anguish," "expert witnesses" and "conflicting expert testimony," all of which had been stricken by Judge Hedges and the Court. Included among these instructions was a one-sentence front pay charge. Defendant's proposed jury charges contained no front pay instruction.

The case was tried to a jury from September 15, 1992 to September 30, 1992. Plaintiffs testified as to their difficulties in attempting to obtain suitable employment after their discharge from PTL. Additionally, evidence was admitted regarding the salaries and benefits of the individuals who were hired by Pacific Rail.

---

1. Pursuant to Section 10:5–17 of the LAD, an employer found to have discriminated on the basis of age, in violation of its terms, may be ordered:

 [T]o cease and desist from such unlawful employment practice or unlawful discrimination and to take such affirmative action, including but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay.

On September 24, 1992, the Court provided to the parties a copy of a jury charge that had been used in an earlier age discrimination matter. *Sabloff v. Illinois Dept. of Revenue*, Civil Action No. 88–5375 (Dec. 7, 1990). The charge, which was to serve as a talking point for instructions in this proceeding, did not contain a reference to front pay.

On September 29, the Court convened a jury-charge conference on the record, where a number of issues were discussed. Defendant specifically objected to plaintiffs' proposed front pay instruction, pointing out that this case had never been litigated as a front pay case, that there had been no expert testimony regarding present value of earnings, and that a substantial number of plaintiffs were taking retirement. Defendant argued that all of these factors mitigated against any front pay instruction.

In addition to its general objection to any front pay instruction, defendant specifically objected to the language of the proposed front pay instruction, arguing that it was improper to permit the jury to calculate front pay on the basis of retirement age. Despite the Court's invitation, counsel for defendant did not provide curative language to the front pay instruction as written. The Court, *sua sponte*, then amended the final sentence of the front pay charge. Ultimately, the front pay charge read as follows:

> Plaintiff is also seeking front pay. Front pay consists of the total earnings, if any, which you find plaintiff has proven he or she will lose from today until the plaintiff reaches the age he or she would have retired. If you have awarded back pay to a plaintiff, then you may, but you are not required to, award front pay for any part of the period between now and plaintiff's retirement age for which you find that plaintiff has shown by a preponderance of the evidence that he or she would have been employed by defendant but for age discrimination.
>
> Again, as with back pay, you may cut off the front pay or you may decline to award any front pay at any point that you believe the evidence to show that plaintiff failed to use reasonable efforts to find a job or beyond which he or she should not be compensated as a result of the age discrimination.

Defendant's counsel objected to the language as modified.

On September 30, 1992, the jury rendered a verdict in favor of plaintiffs and awarded plaintiffs damages in the amount of $7,191,-500 which included a $5,743,500 award for front pay and a $1,448,000 award for back pay. The individual awards are summarized in the Appendix to this Opinion.

The front pay award was apparently calculated by multiplying the number of years remaining between each plaintiff's present age and age 65, times the projected salary for those years had each plaintiff worked for Pacific Rail. Harper and Petruzzelli, who had reached age 65 by the time of the jury's verdict, were awarded no front pay. Plaintiffs Burwitz, Cohen, Dechert, McCarthy and Spina were awarded amounts for which no further computations appear to have been made. The remaining plaintiffs were awarded front pay from which some deductions have been made.

## DISCUSSION

### LIABILITY

*Defendant's Motion for Judgment n.o.v.*

I first address defendant's motion for judgment as a matter of law on the issue of liability. Although the Court in a diversity action must apply New Jersey substantive law, the Court should apply the federal standard for judging the sufficiency of the evidence on a motion for judgment as a matter of law. *Rotondo v. Keene Corp.*, 956 F.2d 436, 438 (3rd Cir.1992). Thus, in ruling on defendant's motion for judgment n.o.v., this Court must determine whether the evidence and justifiable inferences most favorable to the plaintiff afford any rational basis for the verdict. *Anastasio v. Schering Corp.*, 838 F.2d 701, 705 (3rd Cir.1988) (citing *Bhaya v. Westinghouse Electric Corp.*, 832 F.2d 258, 259 (3rd Cir.1987)).

After a careful review of the record, I conclude that there was more than sufficient evidence from which the jury could have found that age was a determinative factor in

Pacific Rail's hiring decisions. *See id.* Accordingly, there is no basis for setting aside the jury's verdict on liability.

■ Plaintiffs' claims arise under the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. § 10:5–1, *et seq.*, which provides, in pertinent part:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination;
>
> a. For an employer, because of the ... age ... of any individual ... to refuse to hire or employ ... such individual.

N.J.S.A. § 10:5–12(a). In interpreting the burdens and allocations of proof under the LAD, New Jersey courts have adopted the standards developed in Title VII cases by federal courts. *See Goodman v. London Metals Exchange, Inc.*, 86 N.J. 19, 31, 429 A.2d 341 (1981); *Slohoda v. United Parcel Service, Inc.*, 207 N.J.Super. 145, 151, 504 A.2d 53 (App.Div.1986), *certif. denied,* 104 N.J. 400, 517 A.2d 403 (1986). These burdens and allocations of proof apply equally to age discrimination cases. *Giammario v. Trenton Board of Education,* 203 N.J.Super. 356, 497 A.2d 199 (App.Div.1985), *certif. denied,* 102 N.J. 336, 508 A.2d 212 (1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1791, 90 L.Ed.2d 337 (1986).

In disparate treatment cases alleging age discrimination, courts have uniformly adopted the allocation and standards of proof set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), with the elements tailored to conform to ADEA cases. *Rodriguez v. Taylor,* 569 F.2d 1231, 1239 (3rd Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978).

A *prima facie* case of discrimination under *McDonnell Douglas* may be made out by showing:

i. that [plaintiff] belongs to a [protected group];

ii. that he applied and was qualified for a job for which the employer was seeking applicants;

iii. that despite his qualifications, he was rejected; and

iv. that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

In the case of an employee who claimed a discriminatory dismissal, the Third Circuit has held that, "in the absence of direct evidence, a plaintiff may establish a *prima facie* case of discrimination by proving ... that ... he ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination." *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 897 (3rd Cir.1987).

■ The establishment of a *prima facie* case gives rise to an inference that the actions taken against a plaintiff were based on discriminatory intent. *Furnco Construction v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). Once a *prima facie* case has been established, the defendant has the burden to put forth a legitimate, nondiscriminatory reason for its actions. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). If the employer meets its burden of production, the plaintiff has the ultimate burden of proof of establishing by a preponderance of the evidence that the employer's articulated reason is merely a pretext for discrimination. *McDonnell Douglas v. Green,* 411 U.S. at 804, 93 S.Ct. at 1825; *Kearny Generating System, Div. of Public Service v. Roper,* 184 N.J.Super. 253, 445 A.2d 1159 (App.Div.1982), *certif. denied,* 91 N.J. 254, 450 A.2d 571 (1982).

■ Once the litigation reaches the stage where a *prima facie* case has been established and a legitimate reason for the employer's action has been articulated, the plaintiff's burden of showing pretext:

> merges with the ultimate burden of persuading the court that [he or she] has been the victim of intentional discrimination. [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *see Duffy v. Wheeling Pittsburgh Steel Corp.,*

738 F.2d 1393, 1396 (3rd Cir.1984), *cert. denied*, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984) ("a showing that a proffered justification is pretextual is itself *equivalent* to a finding that the employer intentionally discriminated") (emphasis in original).

Defendant relies on two arguments in support of its motion for judgment n.o.v.: 1) at least eight named plaintiffs failed to adduce evidence sufficient to sustain a *prima facie* case of age discrimination; 2) no substantial evidence exists in the record to support the jury's verdict that defendant discriminated against each of the 18 named plaintiffs by failing to hire them because of their age.

After a thorough review of the record, I conclude that the evidence plainly supported the finding of liability. All of the plaintiffs established a *prima facie* case at trial. In support of its argument to the contrary, defendant maintains that six of the plaintiffs—Dechert, Demone, Fernandez, Oliver, Tighe, and Shea—did not submit timely applications and that three of the plaintiffs—Dechert, P. Lindh and Petruzzelli—were not qualified.

The evidence at trial established that all the plaintiffs, through their shop steward, informed McCormick of their interest in employment with Pacific Rail. Furthermore, List admitted that "there was a desire for the employees to work for [Pacific Rail]." The evidence also established that 25 North Bergen employees, not including Shea, submitted completed applications to McKenna on or before August 24, 1990 and that McKenna delivered approximately 25 completed applications to McCormick on August 24, 1990. As noted above, Pacific Rail made no effort to gain timely possession of the remaining completed applications and made no effort to contact the North Bergen PTL yard or clerical employees concerning possible employment with Pacific Rail.

Under these circumstances, Pacific Rail's argument that most of the hiring had been completed by the time it received plaintiffs' applications does not require a conclusion that plaintiffs' failed to establish a *prima facie* case. The jury could have justifiably concluded from this evidence that plaintiffs' expression of their desire to continue working in North Bergen and their efforts to submit applications to Pacific Rail effectively started the application process.

A reasonable inference can be drawn from the above evidence that the defendant never intended to give the plaintiffs' applications serious consideration. The jury could have reasonably concluded that Pacific Rail accepted plaintiffs' completed applications to protect itself against potential future litigation. The jury could have further concluded that defendant made offers of employment to some of the former PTL employees as a token gesture.

Pacific Rail also argues that Dechert, P. Lindh and Petruzzelli were not qualified. The above plaintiffs credibly testified as to their qualifications. Each of them worked primarily as gate clerks. They also performed additional clerical duties as well as trailer inspection duties. Pacific Rail continued to perform a 24 hour gate inspection operation after it took over the North Bergen terminal. Since the PTL gate clerks had performed additional clerical duties, which presumably were similar to the clerical duties now being performed by Pacific Rail, the jury was justified in inferring that Dechert, P. Lindh and Petruzzelli were qualified to perform as clerks under the Pacific Rail allocation of clerical job duties. In support of its position that Dechert, P. Lindh, and Petruzzelli were not qualified, defendant points to testimony regarding the sophistication of clerical responsibilities and the training necessary to perform clerical work. This evidence that the duties of clerks were dissimilar to the duties of gate inspectors was apparently rejected by the jury as proof that the plaintiffs in question were not qualified to perform clerical work.

Defendant's argument, as to all the plaintiffs, that no substantial evidence exists in the record to support the jury's liability verdict is unpersuasive. As noted above, once a *prima facie* case is established, the burden of production shifts to the defendant to offer a legitimate nondiscriminatory business reason for its employment decision. *Fowle v. C & C Cola*, 868 F.2d 59, 61 (3rd Cir.1989).

The parties disagree as to the exact reason articulated by Pacific Rail for its hiring decisions. Referring to the testimony of List, plaintiffs argue that defendant's articulated reason for not hiring plaintiffs was their poor work habits and attitudes. On cross-examination, List testified as follows:

Q. As you've testified on direct, the only reason individuals from PTL North Bergen were not hired were their individual work habits and attitudes, is that correct?

. . . . .

A. That's correct.

Defendant maintains, in contrast, that its hiring decisions were influenced by PTL's reputation for poor productivity at the North Bergen terminal and McCormick's personal knowledge of the work force there. Because of this reputation, according to defendant, Pacific Rail would not hire the PTL employee complement "wholesale" but would consider offers only to specific individuals of whom McCormick knew and thought highly, or else who came recommended by those whom McCormick trusted, including Conrail and Conrail's customers. Pacific Rail also points to the testimony of McCormick who testified that he was motivated by an additional factor as to the yard and clerical employees represented by a particular union, Local 807— specifically, that he did not intend to make any individual offers of employment prior to Pacific Rail's takeover on September 1, because he reasonably feared those employees would engage in a slowdown or stoppage.

It is not necessary at this juncture for the Court to decide what reason or reasons were actually "articulated" by the defendant at trial. There was sufficient evidence in the record for the jury's conclusion that any and all of the above proffered reasons were pretextual.

Plaintiffs offered testimony and documents indicating that plaintiffs' work habits and attitudes were exemplary. Of particular importance is the testimony of Ed Cifune, the Terminal Manager at North Bergen. Cifune specifically considered the individual work habits and attitudes of the North Bergen employees. As Terminal Manager, he was in a position to evaluate their work performance. He evaluated each plaintiff positively.

Cifune also compared the relative abilities of the North Bergen and South Kearny employees, because seven yard employees and two clerks from South Kearny were hired by Pacific Rail. Cifune consistently rated the North Bergen employees highly with respect to both the quality and the quantity of their performance as compared to the South Kearny workers.

Thus, the evidence and reasonable inferences to be drawn from the evidence support the plaintiffs' contention that Pacific Rail's proffered reason or reasons for not hiring them were pretextual. In the instant case, the jury obviously found Cifune to be a credible witness. The evaluation of Cifune's credibility cannot be challenged. *Bhaya v. Westinghouse Electric Corp.*, 832 F.2d 258, 262 (3rd Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989) (evaluation of witness credibility is exclusive function of the jury).

In deciding whether the defendant's reason for not hiring the plaintiffs was pretextual, the jury evidently found that McCormick's testimony was unworthy of credence. McCormick's testimony that he was motivated, in part, by fear of a work slowdown or stoppage among yard and clerical employees represented by Local 807, was discredited by other testimony produced by the defendant. Namely, List testified that union activity and membership in Local 807 or Local 641 played no role in Pacific Rail's hiring decisions. Moreover, contradicting his testimony at trial, McCormick had submitted an affidavit to the National Labor Relations Board (NLRB) to the same effect. Furthermore, the unfair labor practice charges filed by Local 807, pertaining to defendant's hiring decisions, were rejected by the NLRB. In refusing to issue a complaint, Regional Director William Pascarell stated, "the investigation disclosed insufficient evidence to conclude that [Pacific Rail] considered union affiliation in its hiring decisions." Pl.Ex. 17.

When confronted with the poor work records of the former South Kearny yard employees hired by Pacific Rail, McCormick

concluded that it was the supervision at South Kearny that was the problem. He testified that the attitude of supervision at South Kearny was "Let's badger the employees and let's disrupt their flow—their work flow." In reference to one former South Kearny employee, McCormick testified that "it was something in his favor that PTL had fired him." The jury had the right to reject this testimony.

In attempting to explain the lack of discipline at North Bergen, McCormick testified that the North Bergen employees would slow down when issued warning letters. He later admitted that no such letters were given to the employees. McCormick's testimony was further discredited by the fact that the same management that issued discipline to the South Kearny workers also had authority over the North Bergen workers. Again, the jury had the right to, and evidently did, reject McCormick's testimony.

In discrediting parts of his testimony, the maxim *"falsus in uno, falsus in omnibus"* is applicable. *Bennun v. Rutgers State University*, 941 F.2d 154, 179 (3rd Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992) (false in one thing, false in everything). The discrediting of McCormick's testimony is fatal to Pacific Rail. *See Thornbrough v. Columbus & Greenville R. Co.,* 760 F.2d 633, 641 (5th Cir.1985) ("determinations regarding motivation and intent depend on complicated inferences from the evidence and are therefore peculiarly within the province of the factfinder").

List was ultimately responsible for staffing the North Bergen terminal, yet he could not give a single specific reason why any particular individual was not hired. List completely deferred to McCormick, even though McCormick had not worked at North Bergen since 1984. McCormick had no personal knowledge as to the North Bergen operation for over six years, and he was unable to describe any specific problems with the work of the individual North Bergen workers.

The only witness called by defendant with actual knowledge of the current work habits and attitudes of the North Bergen employees was Jack Gittens. Gittens' testimony is devoid of specific negative comments concerning the individual plaintiffs. To the contrary, Gittens testified that he complemented the plaintiffs. Gittens did not have any knowledge of the workers on the day or afternoon shifts. Furthermore, Gittens recommended four former North Bergen yard employees for employment: Armetta, Angolemmo, Nazare and Montacalvo. Only the two younger employees, Angolemmo and Armetta, were hired by Pacific Rail.

Moreover, a negative inference can be drawn against Pacific Rail from evidence showing that the employees at North Bergen were ultimately replaced by a substantially younger work force. In August 1990, 79% of the employees on the PTL North Bergen seniority lists for clerks and yard employees were over 40 years old. Only 16% of the newly hired Pacific Rail employees hired for these positions were over 40 years old. This numerical evidence buttresses the jury's finding that the reason given by the defendant for not hiring the plaintiffs was pretextual and that the true reason was age discrimination.

In sum, the issue of liability was one clearly delineated for jury determination. The evidence at trial and reasonable inferences to be drawn from the evidence fully support the jury's obvious conclusion that defendant's explanation for not hiring the former North Bergen PTL employees was "unworthy of credence." Defendant's roll of the dice with the jury failed to record a seven or eleven. It was a two, three or twelve. Accordingly, the liability verdict cannot be overturned.

*Defendant's Motion for New Trial*

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial may be granted where the moving party meets the heavy burden of showing that the verdict is clearly against the weight of the evidence or is necessary to correct an injustice. *Roebuck v. Drexel University,* 852 F.2d 715, 736 (3rd Cir.1988); *American Bearing Co., Inc. v. Litton Industries,* 729 F.2d 943, 948 (3rd Cir.), *cert. denied,* 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984); *Universal Computers v. Datamedia Corp.,* 653 F.Supp. 518, 523 (D.N.J.1987), *aff'd,* 838 F.2d 1208 (3rd Cir.1988). Courts repeatedly caution that "a

court must be careful not to usurp the jury's function and should not substitute its judgment for that of the jury." *Borbely v. Nationwide Mutual Ins. Co.,* 547 F.Supp. 959, 980 (D.N.J.1981). A new trial can be granted due to an excessive damages award only if the verdict is "so grossly excessive as to shock the judicial conscience." *Gumbs v. Pueblo International, Inc.,* 823 F.2d 768, 771 (3rd Cir.1987) (citing *Edynak v. Atlantic Shipping, Inc.,* 562 F.2d 215, 225–26 (3rd Cir.1977)); *Taweel v. Starn's Shoprite Supermarket,* 58 N.J. 227, 236, 276 A.2d 861 (1971).

■ Defendant first contends that a new trial should be granted given the absence of evidence to support the jury's finding of liability. As discussed in great detail above, there was more than sufficient evidence to support the jury's finding of liability. Accordingly, a new trial is not warranted on the ground of insufficiency of evidence.

■ Defendant next argues that a new trial is necessary because the Court committed prejudicial error in charging the jury on liability. Specifically, defendant objects that the Court's charge improperly required, rather than merely permitted, the jury to find discrimination if it did not believe the defendant's proffered reason for not hiring the plaintiffs. Pacific Rail argues that the effect of the Court's instruction was to erroneously shift to the defendant the ultimate burden of persuading the trier of fact that it was *not* motivated by impermissible discriminatory animus in refusing to hire the plaintiffs. I disagree.

The sections of the charge quoted below clearly placed the burden on the plaintiffs to prove that the employer's proffered explanation was unworthy of belief and was offered to avoid disclosure of the true reason, namely, age discrimination:

> An employer is entitled to make his own policy and business judgments in hiring or not hiring, so long as this is not a pretext for discrimination. *So long as a business judgment is not an excuse or cover-up for discrimination, the law—the New Jersey Law Against Discrimination—does not trigger a finding of violation of the Act.*

Conversely, if the reason given is a cover-up for discrimination, then, in that event, the protective effects of the Act are triggered and there is a violation of the Act.

. . . .

The defendant is not liable if it acted upon one or more legitimate nondiscriminatory reasons for its refusal to hire the plaintiff. The defendant has no burden of proving good cause or failure in its refusal to hire plaintiff. The defendant need only introduce evidence to create a factual issue concerning the existence of a legitimate justification for the action. *The plaintiff must prove, by a preponderance of the evidence, that the employer's proffered reason was merely a pretext or cover-up for age discrimination.*

. . . . .

Ladies and gentlemen, it will be up to you to determine in this case whether the defendant intentionally discriminated against plaintiff because of his or her age in refusing to hire him or her.

In order to find in favor of the plaintiff, you must determine that he or she had established, by a preponderance of the believable evidence, at least one of the following two propositions: . . . .

On this second ground, you are to consider the reasons offered by the defendant for refusing to hire the plaintiff. If plaintiff establishes by a preponderance of the believable evidence that the reasons offered by defendant for its actions are a pretext, that is, they are not the real or true reasons, that these reasons offered are unworthy of belief, then plaintiff will have established his or her claims of intentional age discrimination on this ground.

In other words, *if you find that the reasons which the defendant has presented to you in this case are not the real or true reasons for defendant's refusal to hire plaintiff, but, rather, have been presented to hide or avoid disclosure of the true reason; namely, age discrimination, then you will have determined these reasons which the defendant has presented here are merely a pretext, in which case plain-*

*tiff is entitled to a verdict in his or her favor.*

In determining whether the reasons which defendant has asserted are or are not a pretext, you should not analyze those reasons for their wisdom or to determine whether they were the result of good, informed business judgment. You are not called upon to decide whether defendant's decisions were mistakes or even generally unfair, or for good cause. If you conclude that the defendant had the honest belief and motivation that it was in its best interests not to hire the plaintiff, whether or not you agree with this decision as a matter of business judgment, then plaintiff will not have sustained his or her burden of proving that the defendant's reasons was a pretext, for you will thus have found that the reasons advanced in this case by the defendant were true, whether or not they were the result of the best business judgment.

If I may recap for you. If you find that plaintiff has established by a preponderance of the believable evidence either one, that his or her age was a determining factor but for which he or she would have been hired; or, two, that the reasons advanced by the defendant for not hiring plaintiff were a pretext, a reason or reasons unworthy of credence, then plaintiff will have established his or her claim of intentional age discrimination and you must return a verdict in his or her favor. If, however, he or she has failed to establish either of those two propositions, then your verdict must be in favor of the defendant.

This charge as a whole fully complies with *Burdine* and *Chipollini* and rebuts defendant's claim that the jury was in any sense misled. In fact, this is the standard applied by this Court in the nonjury Title VII case of *Bennun v. Rutgers State University,* 737 F.Supp. 1393 (D.N.J.1990), which was subsequently affirmed by the Third Circuit. 941 F.2d 154 (3rd Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992). Thus, the jury charge is not a valid basis for granting defendant's new trial motion.

██ Defendant next argues that a new trial should be ordered because the Court improperly admitted into evidence as plaintiffs' Exhibit 20 a series of documents consisting of personnel records maintained by PTL at its South Kearny facility for five of the persons Jerry McCormick hired to work at North Bergen. According to defendant, plaintiffs' failure to produce an authenticating witness for the documents rendered the documents inadmissible hearsay. *See* Fed. R.Evid. 803(6) (requiring authentication for admission of business records). Pacific Rail further complains that the documents' relevancy was marginal, while their concomitant capability to inflame the passions of the jury on issues not properly before it, was very great.

Rule 402 of the Federal Rules of Evidence states that, subject to the Constitution and laws of the United States, and the remaining Rules of Evidence, all "relevant" evidence as defined in Rule 401, is admissible while evidence that is not relevant is inadmissible. Pursuant to Rule 403 of the Federal Rules of Evidence, the Court may exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Mindful of these standards and the circumstances surrounding admission of Plaintiffs' Exhibit 20, the Court concludes that admission of the documents was proper. The documents were provided to plaintiffs in response to a subpoena *duces tecum* served upon PTL by plaintiffs in the discovery phase of this case. Thus, all parties had copies of these documents at the discovery stage of the case and long before the trial.

██ At sidebar, counsel for plaintiffs provided the Court with a copy of the cover letter PTL sent plaintiffs to accompany the subpoenaed documents. The cover letter was signed by Ms. Kathleen Lilly. The following exchange took place:

THE COURT: Where did you get the materials, Mr. Nikolaidis?

MR. NIKOLAIDIS: I got them by subpoena with this cover letter coming from a representative of PTL.

THE COURT: If you want me to, I'll have Kathleen Lilly come in here and testify. Do you want that?

MR. KYLE: No.

After considerable argument on the record at sidebar, the Court declared that the documents would be admitted into evidence, to the extent that they appeared to be fair and regular in form.[2]

This above exchange at sidebar reveals that the defendant declined to have an authenticating witness brought in to testify when given the opportunity, and thus, effectively waived its right to challenge authentication of the documents. The Court will nonetheless address the question of the documents' admissibility.

Rule 901(a) of the Federal Rules of Evidence provides that the requirement of authenticity is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(b)(4) permits authentication of a document based upon its "appearance, contents, substance ... or other distinctive characteristics, taken in conjunction with the circumstances." Given the circumstances in this case—i.e., production of the Exhibit 20 documents in discovery and prior access to the documents by all parties—it was proper for the Court to admit these documents which were "regular in form and nature and came out of the personnel file." The documents in Plaintiffs' Exhibit 20 were regular in form and consisted of warning letters, letters of discharge, and notes of accidents. Under Fed.R.Evid. 901(b)(4), these documents were authenticated.

The nature of defendant's assertions further supported admission of these documents. McCormick testified that at least part of the reason he hired people other than the plaintiffs for work at North Bergen is that the people he hired had "better work habits and attitudes" than plaintiffs. Documentary evidence showing the poor work habits and poor work attitudes of the people

Pacific Rail ultimately hired is plainly relevant to refute McCormick's contention. The obvious relevance of this material renders defendant's Rule 403 argument without merit. Defendant has articulated no "unfair prejudice" or "confusion of the issues" and has not shown any likelihood that the jury was misled by Plaintiffs' Exhibit 20.

■ Finally, defendant objects to four allegedly "improper, inflammatory" statements made by plaintiffs' counsel in arguing to the jury. No objection to the comments was made at trial. These comments were: 1) that Pacific Rail Service had "lied" to Conrail; 2) that defendant's counsel spoke in discriminatory "code" words and sent recognized signals of discrimination in his speech; 3) that the jury should infer wrongdoing from the fact that defendant's key witness had "changed" his testimony after a break in the trial; and 4) that defendant's counsel had not contradicted plaintiffs' numbers from the opening argument.

The statements of counsel were fair comment and do not rise to the level necessitating a new trial. *Draper v. Airco, Inc.*, 580 F.2d 91, 97 (3rd Cir.1978). The Court had previously instructed the jury that comments by counsel were not evidence. At worst, these remarks were "isolated comments in the context of an otherwise proper summation and with the benefit of the court's instruction." *Anastasio v. Schering Corp.*, 838 F.2d at 706.

DAMAGES

*Back pay*

■ The Court now considers defendant's contention that the back pay awards are not supported by the evidence. Defendant urges the Court to set aside the back pay awards because the jury allegedly failed to consider interim earnings and because the total back pay awarded to the clerical employees allegedly exceeded the actual clerical payroll at the North Bergen facility for the relevant period. Neither argument is persuasive. At the outset, it should be noted that the defendant successfully objected to the introduction into evidence of plaintiffs'

---

2. The Court did refuse the admission of selected documents offered by the plaintiffs.

proposed summary of plaintiffs' interim earnings. Furthermore, defendant fails to direct the Court's attention to evidence of interim earnings placed before the jury which the jury failed to consider.

The difference that defendant has noted between the back pay awarded to the clerical employees and the actual clerical payroll at North Bergen disappears when one considers that the jury evidently presumed that defendant understated its actual clerical payroll at North Bergen by failing to count the wages and benefits paid to John Palumbo. The testimony of Sal Petruzzelli showed that John Palumbo was assigned by defendant to work as a clerical employee at North Bergen but was given a slightly higher nonunion title so he could continue to draw his pension from Local 807. Thus, the jury was fully warranted in presuming that defendant's Exhibit 14 understated the real clerical wages paid at the North Bergen facility.

█ There is yet another reason for dismissing this contention. Defendant overstates the back pay awarded to these clerical employees by counting as interim earnings the Local 807 pension benefits received by plaintiffs Dechert, Demone, P. Lindh, Noethe and Petruzzelli. The pension income received by the plaintiffs should not be set off as interim earnings or otherwise deducted from back pay under the collateral income source rule, because the plaintiffs, in effect, paid into the Pension Fund by virtue of the hourly contributions paid to the Fund in lieu of wages under the collective bargaining agreement. *Dillon v. Coles*, 746 F.2d 998 (3rd Cir.1984); *Smith v. United States*, 587 F.2d 1013 (3rd Cir.1978) (Social Security benefits not deductible from tort claims award because plaintiff had paid into the special Social Security Fund).

█ Defendant also contends that the charge may have confused the jury. The Court's charge on back pay is a succinct statement of the applicable rule:

Plaintiff is seeking two types of damages, back pay and front pay. In determining back pay damages, you may award plaintiff back pay; that is, you are to award plaintiff an amount equal to the lost wages and

the value of the employee's health and pension benefits that he or she would have received from the defendant had he or she been hired from the time that he would have started employment until the date of trial.

You should deduct from your back pay award whatever wages or earnings the plaintiff has obtained from other employment or work during this period.

If defendant proves by a preponderance of the evidence that plaintiff unjustifiably failed to take a new job of like kind, status and pay which is available to him or her, or failed to make reasonable efforts to find a new job, you should subtract from his or her damages any amount he or she could have earned in a new job after he or she was not hired by the defendant.

There is no basis for defendant's complaint with respect to this charge.

In sum, the back pay damages awarded by the jury are fully supported by the evidence. Thus, defendant's motion for a new trial on the issue of back pay, or in the alternative *for judgment as a matter of law* on the issue of back pay or for remittitur is denied.

*Front Pay*

█ Defendant next submits that it is entitled to have the jury's front pay award set aside and that no new trial should be granted on front pay. After a careful review of the record, I am persuaded that the relief sought by defendant must be granted because the front pay award is unsupported by the evidence and the law, and failure to strike the award would constitute manifest injustice.

█ The issue of front pay in an LAD case generally involves a jury determination of "whether there [will] be pecuniary losses in the future attributable to the defendant's conduct, and if so, the extent and current valuation of the losses." *Levinson v. Prentice–Hall, Inc.*, 868 F.2d 558 (3rd Cir.1989). In this regard, the Third Circuit has noted that "[w]hile ... there are uncertainties in determinations of this kind, they are probably made in various contexts in New Jersey courts on an almost daily basis." *Id.* (citing *Theobold v. Angelos*, 40 N.J. 295, 304–05, 191

A.2d 465 (1963); *Kozlowski v. Kozlowski,* 80 N.J. 378, 387, 403 A.2d 902 (1979)). In fact, lost future earnings calculations are regularly made in both personal injury actions and actions arising under New Jersey's wrongful death statute. *See Ruff v. Weintraub,* 105 N.J. 233, 519 A.2d 1384 (1987) (lost future earnings of motorist who suffered serious injuries in car accident); *Tenore v. Nu Car Carriers,* 67 N.J. 466, 341 A.2d 613 (1975) (survivor's pecuniary loss in wrongful death action).

While the front pay issue should typically be approached by consideration of such New Jersey case law, *see Levinson,* 868 F.2d at 564, it may be appropriate, when urged by the defendant, to resolve the front pay issue in some equitable fashion, borrowing procedures from Title VII law, *id.* at 563, and ADEA law.

This Court has thoroughly examined the front pay issue under both federal and state law standards and draws the same conclusions: (1) that it was error for this Court to submit the front pay issue to the jury in the first instance; and (2) that the front pay awards must be vacated in their entirety with no opportunity for a re-trial.

With regard to the New Jersey standards, this Court is guided, in part, by personal injury case law involving the issue of loss of earning capacity. The New Jersey Supreme Court has determined that "[b]efore a jury can consider loss of earning capacity, there must be evidence demonstrating a 'reasonable probability that [plaintiff's] injuries will impair future earning capacity.'" *Lesniak v. County of Bergen,* 117 N.J. 12, 21, 563 A.2d 795 (1989) (citing *Coll v. Sherry,* 29 N.J. 166, 148 A.2d 481 (1959) ("if plaintiff introduces evidence showing there is a reasonable probability that his injuries will impair his future earning capacity and sufficient factual matter upon which the *quantum* of diminishment can reasonably be determined, the jury may properly be instructed that it can consider this item in establishing damages")).

Moreover, in cases involving future lost income, Supreme Court of New Jersey has made clear that the proper measure of damages is net income after taxes, *Ruff v. Weintraub,* 105 N.J. 233, 519 A.2d 1384 (1987) (personal injury action), discounted to present value. *Tenore v. Nu Car Carriers,* 67 N.J. 466, 341 A.2d 613 (1975) (action arising under New Jersey's wrongful death statute). In fact, "the law of [the Third Circuit] places the burden on the plaintiff to produce evidence permitting a rational reduction to present value." *Abdulghani v. Virgin Islands Seaplane Shuttle, Inc.,* 746 F.Supp. 583, 593 (D.V.I.1990) (quoting *Gorniak v. National R.R. Passenger Corp.,* 889 F.2d 481, 486 (3rd Cir.1989)). "The defendant has no burden to produce such evidence." *Id.* at 593–94 (citing *DiSabatino v. National R.R. Passenger Corp.,* 724 F.2d 394, 396 (3rd Cir. 1984)). Elaborating on this burden, one district court remarked:

> [P]laintiff must produce some method which allows the jury to make a computation. This can be either in the form of table or in the form of testimony as to the inflation and discount rates. Although plaintiff need not introduce both types of evidence to the jury, the failure to produce one or the other is fatal.

*Id.* at 596. Additionally, the Third Circuit, applying New Jersey personal injury law, has determined that in the absence of evidence and instructions on reducing a loss of future earnings award to present worth, the award would be based upon conjecture and could not stand. *Russell v. City of Wildwood,* 428 F.2d 1176, 1179–81 (3rd Cir.1970).

Similarly, in *Tenore v. Nu Car Carriers,* 67 N.J. 466, 341 A.2d 613 (1975), the New Jersey Supreme Court held that in wrongful death actions, the jury should consider the effect of future inflation on future losses; to reduce the possibility of undue conjecture the plaintiff should also have an opportunity to offer expert economic testimony on the question to provide the jury with informed guidelines. The Supreme Court determined, in *Tenore,* that the trial court had properly excluded tables prepared by an expert economic witness purporting to show the survivor's aggregate damages, because, *inter alia,* the tables assumed that there would never be a lapse in the wage earner's earning capacity because of illness, incapacity, change of jobs, layoffs, etc.

■ The Court now reviews federal discrimination law. Under the ADEA, the decision whether to award front pay is within the trial court's discretion. *Dillon v. Coles,* 746 F.2d 998 (3rd Cir.1984) (citing *Fitzgerald v. Sirloin Stockade, Inc,* 624 F.2d 945 (10th Cir.1980)). The court's exercise of discretion, however, must be sound and consistent with the purpose of making a victim of discrimination whole and restoring him to the economic position he would have occupied but for his employer's unlawful conduct. *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 795 (3rd Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986).

■ Further, in an ADEA case, the district court must decide "whether reinstatement is feasible or whether front pay should be awarded in lieu of reinstatement." *Blum v. Witco Chemical Corp.,* 829 F.2d 367, 374 n. 4 (3rd Cir.1987). Once this equitable decision has been made by the trial court, "the amount of damages available as front pay is a [question for the finder of fact]." *Id.* (citing *Maxfield,* 766 F.2d at 796). The Third Circuit has noted:

> A claimant's work and life expectancy are pertinent factors in calculating front pay, just as they are in assessing damages for future loss of earnings in breach of employment contract and personal injury cases. The purpose of front pay under the ADEA is to ensure that a person who has been discriminated against on the basis of age is made whole, not to guarantee every claimant who cannot mitigate damages by finding comparable work and annuity to age 70.

*Anastasio v. Schering Corp.,* 838 F.2d 701 (3rd Cir.1988). Thus, in making a decision on front pay in an age discrimination case, the jury should consider the "reasonable period required for the victim to establish his rightful place in the job market." *Weiss v. Parker Hannifan Corp.,* 747 F.Supp. 1118, 1135 (D.N.J.1990).

This review of case law makes at least one thing crystal clear: that in attempting to address the manifest uncertainties that otherwise render a front pay claim impermissibly speculative, the trier of fact must consider a myriad of factors. Mindful of this fact,

the Court finds that the plaintiffs did not even advance a proper claim for front pay, let alone litigate a future earnings issue that arose under New Jersey state law.

The Complaint did not specifically seek front pay and the parties had not discussed front pay in any proceeding before the Court prior to the close of plaintiff's case-in-chief. Plaintiffs not only failed to make any specific request for front pay in the Final Pretrial Order, but plaintiffs also failed to comply with the accompanying Order of the Court, pursuant to the pre-trial conference, that plaintiffs "quantify damages by March 16, 1992." Indeed, plaintiffs never complied with that Order of the Court.

The failure of the plaintiffs to make any claim for front pay in the Complaint, and their failure to quantify their damages as directed in the Court's Final Pretrial Order—which would have included, presumably, some reference to front pay—was prejudicial to the defendant, because defendant was thus never placed on notice—either actual or constructive—that front pay was an issue in this case. In short, the issue of front pay was never a claim or issue defined by the plaintiffs in this case.

Moreover, plaintiffs did not produce the type of evidence necessary to prove front pay losses due to defendant's failure to hire them. Plaintiffs adduced partial evidence of "work expectancy" in their efforts to show that they searched for work. However, plaintiffs had not established a reasonable probability of continued employment with Pacific Rail apart from the age discrimination. In fact, the evidence in the record supports a conclusion that plaintiffs' prospects for future employment with Pacific Rail were dim.

The evidence established that, in its efforts to increase the efficiency of the North Bergen operation, PTL was attempting to downsize its work force. In fact, the number of clerks in North Bergen had decreased from 12 to 7 between 1984 and 1990. Moreover, implementation of the Supplemental Agreement entered into between PTL and the union immediately eliminated one yard position and would ultimately have reduced the yard crew from 19 to 15 employees. Fur-

ther, the record includes testimony that "the recession" had resulted in a decrease of work volume at the North Bergen facility after Pacific Rail had taken over. Finally, the evidence indicated that the contract between Pacific Rail and Conrail was of only three year's duration and was terminable with 30 days' notice.

Finally, plaintiffs offered no evidence, by expert testimony or otherwise, that addressed the complicated task of assessing future damages that is typically associated with an evidentiary showing for front pay. Specifically, plaintiffs made no attempt to admit evidence that would enable the jury to reduce a possible front pay award to present value.

In view of plaintiffs' failure to identify a claim for future lost earnings and failure to make an evidentiary showing sufficient to sustain any front pay awards, the Court concludes that there was no rational basis for the jury's front pay awards and the resulting front pay figures cannot be sustained.

 Moreover, the Court finds that a new trial on the issue of front pay is not warranted in this case. Plaintiffs were given ample opportunity during the earlier phases of this litigation to obtain discovery and designate experts. Clearly, the plaintiffs should not be given the opportunity at this late stage to correct all of the errors committed by them in proceeding with this case and to fill the gaps in their proofs. The trial was the trial and not a prelude or preview of the trial. There are not two bites at the apple. To order a second trial would constitute a manifest injustice.

*Prejudgment Interest*

 The Court now considers whether the plaintiffs should receive prejudgment interest on the back pay awards. The LAD § 10:5–13 states, in pertinent part:

All remedies available in common law tort actions shall be available to prevailing plaintiffs.

By Court Rule, New Jersey specifically provides for prejudgment interest in tort actions. Rule 4:42–11(b) states in pertinent part:

[T]he court *shall*, in tort actions ... include in the judgment simple interest calculated as further provided, from ... a date six months after the date the cause of action arises.

*See, e.g., Busik v. Levine,* 63 N.J. 351, 307 A.2d 571 (1973), *appeal dismissed,* 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1974); *Milazzo v. Exxon Corp,* 243 N.J.Super. 573, 580 A.2d 1107 (Law Div.1990). Awarding prejudgment interest in LAD actions is consistent with the practice of awarding prejudgment interest in federal discrimination cases. *See, e.g., Loeffler v. Frank,* 486 U.S. 549, 558, 108 S.Ct. 1965, 1971, 100 L.Ed.2d 549 (1988) ("Prejudgment interest, of course, is an element of complete compensation."). Rule 4:42–11(b) of the New Jersey Court Rules establishes the specific prejudgment interest rate to be applied. The Court will apply these rules.[3]

## ATTORNEYS' FEES

 The statutory authority for granting fees in this case is provided by N.J.S.A. § 10:5–27.1. That section states:

In any action or proceeding brought under this act, the prevailing party may be awarded a reasonable attorney's fee as part of the cost, provided however, that no attorney's fee shall be awarded to the respondent unless there is a determination that the charge was brought in bad faith.

Plaintiffs are clearly the prevailing parties in this case. Once entitlement to an attorney's fee award is established, the issue becomes how a "reasonable fee" is to be set. Because New Jersey courts generally look to cases interpreting the federal civil rights laws in

---

**3.** Although in federal discrimination actions, the interest rate and methodology to be applied are left to the trial court's discretion, *Weiss v. Parker Hannifan Corp.,* 747 F.Supp. 1118 (D.N.J.1990), in a diversity case, the court should apply the law and the methodology set forth in the New Jersey Court Rules. The Third Circuit presumes that

prejudgment interest will be awarded to prevailing discrimination plaintiffs "except where the award would result in unusual inequities." *Green v. USX Corp.,* 843 F.2d 1511 n. 16 (3rd Cir.1988) (court reversed district court's denial of prejudgment interest).

construing the LAD, this court is guided by the standards applicable to Civil Rights cases under 42 U.S.C. § 1988 ("§ 1988") in ruling on plaintiffs' application.

Section 1988 does not define reasonable but both the House and Senate Reports refer to *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714 (5th Cir.1974), which delineates twelve (12) factors to be considered by the court.[4]

In *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1982), the Supreme Court addressed how a § 1988 attorneys' fee application should be approached. The starting point for determining an award of fees is the product of ". . . the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* at 433, 103 S.Ct. at 1939. The plaintiff must submit evidence in support of the number of hours worked and the hourly rates claimed. If the evidence documenting the number of hours is insufficient or inadequate, a court may reduce the award as may be appropriate. *Id.* Hours not "reasonably expended" should be excluded. After making this initial calculation, the court can adjust the fee award either up or down with particular reference to the "results obtained." An upward adjustment is appropriate only "in some cases of exceptional success." *Id.* at 435, 103 S.Ct. at 1940.

The Third Circuit Court of Appeals has developed a two step analysis for determining reasonable fees under § 1988 which has been termed the "lodestar" approach. Under the lodestar analysis the court determines the lodestar by multiplying the number of hours reasonably expended on a successful claim by a reasonable hourly rate for each attorney involved. Then, once the lodestar is determined, the court may adjust the lodestar figure based upon the quality of the work performed as evidenced by the work observed, the complexity of the issues and the recovery obtained. *See Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 167 (3rd Cir.1973) ("*Lindy I*"); *Merola v. Atlantic Richfield Co.,* 515 F.2d 165, 168 (3rd Cir.1975); *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 117 (3rd Cir.1976) ("*Lindy II*").

In determining the reasonable rate in an attorney's fee application, the District Court must first determine "the prevailing market rates in the relevant community." *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). Under the *Blum* formulation, the court must ascertain whether "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.* at 896 n. 11, 104 S.Ct. at 1547 n. 11.

After review of the extensive documentation submitted in support of and in opposition to this application, the Court finds that an award of $104,166.65 in attorneys' fees and $4,058.55 in expenses, for a total of $108,225.20, represents a reasonable fee under the LAD. This figure represents the product of a reasonable number of hours expended by each attorney in furtherance of the action multiplied by a reasonable billing rate for each of the three attorneys. The breakdown is as follows: (1) 389.70 hours of work performed by Louie Nikolaidis at an hourly rate of $150; (2) 59.33 hours of work performed by Daniel E. Clifton at an hourly rate of $185; and (3) 187.76 hours of work performed by Thomas M. Kennedy at an hourly rate of $185. The sum of $4,058.55 represents the total costs incurred in the litigation of this matter.

---

4. The twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d at 717–19. These factors derive directly from the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2–106 (1980).

The Court notes that the hourly billing rates for Louie Nikolaidis, Daniel E. Clifton, and Thomas M. Kennedy were reduced from $185 to $150 per hour, $250 to $185 per hour, and $300 to $185 per hour, respectively. These hourly rates are comparable to the rates charged by attorneys with similar experience in similar size law firms in the community.[5]

■ Finally, the Court finds that the success achieved was not "exceptional" warranting an upward adjustment of the award.

## PLAINTIFF NAZARE'S MOTION TO VACATE DISMISSAL

■ On September 16, 1992, at the start of trial, Pacific Rail moved to dismiss certain plaintiffs' claims, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. At that time, Louie Nikolaidis, counsel for all plaintiffs, consented to the dismissal of plaintiff Anthony Nazare, and dismissal was so ordered as to Nazare, among others. By Order of the Court, entered as Judgment in this matter on November 16, 1992, the Court ordered that the Complaint of Nazare was dismissed with prejudice.

Plaintiff Nazare, armed with new counsel and after the jury's verdict, now seeks to resurrect his lawsuit through a Motion to Vacate Dismissal, pursuant to Rule 60(b)(1) and (6). Nazare claims that his desire to participate in the litigation was not properly communicated to his attorney, and he blames his attorney as well as plaintiff Peter McKenna for the misunderstanding.

Rule 60(b) states, in part:

the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; or for (6) any other

reason justifying relief from the operation of the judgment.

■ An order vacating dismissal under Rule 60(b) is an extraordinary remedy that should be granted only in exceptional circumstances. *See Larson v. Heritage Square Associates,* 952 F.2d 1533, 1535 (8th Cir.1992). Such circumstances are not evident from Nazare's proffered proof.

■ Initially, I find that Nazare's attorney had authority to stipulate to an entry of judgment. Although it is well settled that an attorney has no power to consent to a dismissal of his client's case without the express authority of his client, *Associates Discount Corporation v. Goldman,* 524 F.2d 1051, 1053 (3rd Cir.1975), the mere existence of confusion between a client and his counsel will not automatically justify vacating the underlying judgment. *See Larson v. Heritage Square Associates,* 952 F.2d at 1537. The express authority can be "actual, implied, or apparent authority to consent to the judgment." *Surety Insurance Company of California v. Williams,* 729 F.2d 581, 583 (8th Cir.1984).

■ Moreover, the party asserting a lack of authority must sustain "a heavy burden to establish that [his] attorney acted without any kind of authority in agreeing to the entry of judgment in the trial court ... though competent evidence that [his] attorney lacked actual, implied, or apparent authority to stipulate to an entry of judgment." *Id.; see also Larson v. Heritage Square Associates,* 952 F.2d at 1537.

In the instant case, the assertions in Nazare's affidavit are insufficient to establish that his attorney lacked authority to consent to dismissal of Nazare's case. To the contrary, the affidavit demonstrates that Nazare conveyed authority to his attorney in several ways. Nazare initially conveyed his lack of

---

5. Plaintiffs' own evidence demonstrates the reasonableness of these rates. The October 1990 Declaration of Anne P. McHugh reveals that the regular rates charged by McHugh's firm, Pelletieri, Rabstein & Altman of Princeton, New Jersey, were, in relevant part, $150 per hour for attorneys with up to ten years' experience and $185 per hour for attorneys with between 10 and 20 years' experience. Additionally, the Affidavit of Alan Medvin, whose practice consists of representing plaintiffs in contingent fee litigation, primarily personal injury cases, reveals that as of June 1990, when Medvin had practiced law for nearly 18 years, he was charging rates of between $180 and $200 per hour. Mr. Nikolaidis has been practicing law for under 10 years, Mr. Clifton has practiced for a period in excess of 14 years, and Mr. Kennedy has practiced for about 18 years.

interest in the litigation by failing to directly talk to his attorney after receiving the attorney's letter informing him of the pre-trial preparation meeting with the other plaintiffs in the litigation. The letter specifically noted: "Remember, your failure to appear at the trial will probably result in the jury not awarding you any money damages."

The only step Nazare took was to leave a brief message during a one-minute phone call with his attorney's secretary. Nazare never took any subsequent step to see if his message had been received. Moreover, his message merely said that he would not be available for the trial because of his recuperation from surgery. The message did not expressly indicate a desire to appear at trial. Nor did his message request that the attorney call him back, though the attorney's secretary volunteered to have the attorney contact Nazare if there was a problem. Nazare did not attend the pretrial preparation meeting and made no subsequent efforts to contact his attorney during the weeks preceding trial.

Then, on September 14, 1992, according to Nazare's affidavit, plaintiff Peter McKenna came to Nazare's home and informed him of the trial date. McKenna also said that he was going to tell Nazare's counsel that Nazare was no longer interested in pursuing the case and wanted to be dropped from the litigation. Nazare took no steps to contact his attorney and countermand the authority conveyed by McKenna. Thus, Nazare's affidavit reveals that his own conduct and lack of action gave his attorney both implied and apparent authority to consent to dismissal of Nazare's case.

Moreover, Nazare's proof demonstrates that Nazare's lack of initiative is the primary reason that his desires were "miscommunicated" to his attorney. As such, Nazare is to blame for any confusion, mistake or neglect, and he is not an innocent victim of attorney error. It is extremely significant to note that Nazare's "renewed" interest in his claim occurred after the jury verdict in this case.

Finally, defendant is blameless in this matter and will suffer substantial harm if the judgment is vacated. Defendant has already incurred costs and attorneys' fees resulting from the nine day trial. Nazare had the opportunity to be a part of that trial. A separate trial for Nazare at this late date would be extremely unfair and prejudicial since defendant did nothing to cause or enhance Nazare's problem. Accordingly, plaintiff Nazare's motion to vacate his dismissal is denied.

In sum: defendant's motion for judgment as a matter of law on the issue of liability is **DENIED**; defendant's motion seeking a new trial is **DENIED**; defendant's motion seeking judgment as a matter of law on the issue of damages is **GRANTED WITH RESPECT TO FRONT PAY**; plaintiffs' motion for pre-judgment interest is **GRANTED**; plaintiffs' application for attorneys' fees is **GRANTED IN PART AND DENIED IN PART**; and plaintiff Nazare's motion to vacate his dismissal from the Complaint is **DENIED**.

The plaintiffs shall submit a proposed Final Judgment Order, on notice to the defendant, in accordance with this Opinion.

**SO ORDERED:**

## APPENDIX

| | FRONT PAY | BACK PAY | AGE |
|---|---|---|---|
| Burwitz | 750,000 | 84,500 | 50 |
| Cohen | 50,000 | 84,500 | 64½ |
| Dechert | 450,000 | 84,500 | 56¾ |
| Demone | 129,000 | 74,500 | 62½ |
| Fernandez | 516,000 | 91,000 | 53¹¹⁄₁₂ |
| Harper | | 84,500 | 65 |
| D. Lindh | 220,000 | 83,000 | 60 |
| P. Lindh | 435,000 | 96,000 | 56 |
| McCafferty | 494,000 | 71,500 | 52 |
| McCarthy | 900,000 | 84,500 | 47⅛ |
| McKenna | 444,000 | 92,000 | 56 |
| Noethe | 234,500 | 84,500 | 60 |

| | FRONT PAY | BACK PAY | AGE |
|---|---|---|---|
| Oliver | 215,000 | 81,500 | 60¾ |
| Petruzzelli | | 84,500 | 67 |
| Ricciardi | 106,000 | 31,000 | 57 |
| Shea | 330,000 | 89,000 | 54 |
| Spina | 50,000 | 84,500 | 64 |
| Tighe | 420,000 | 62,500 | 51 |
| TOTALS | 5,743,500 | 1,448,000 | |